IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| D.B., AS NEXT FRIEND OF R.M.B., A MINOR, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | 1:15-cv-745 (JCC/JFA) |
| DARRYL POSTON, EXECUTIVE DIRECTOR, NORTHERN VIRGINIA JUVENILE DETENTION CENTER, et al., | ) ) ) ) ) | |
| Respondents. | ) | |

**M E M O R A N D U M   O P I N I O N**

R.M.B.,[1] a 16-year-old minor and citizen of Guatemala,
is currently in the custody of the federal government after the
Department of Homeland Security designated him an "Unaccompanied
Alien Child" on December 15, 2013.  Since then, he made one
appearance before an immigration judge who terminated his
immigration proceedings.  Yet, R.M.B. remains in the custody of
the Department of Health and Human Services, which refuses to
release R.M.B. to the custody of his mother, D.B., who currently
lives in Texas.

This matter is before the Court on D.B.'s Petition for
a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241.  [Dkt. 1.]

---

[1] Given the sensitive nature of the issues involved in this
proceeding, the Court refers to all individuals by their
initials.

1

For the following reasons, the Court will deny the Petition.

## I. Background

The Court makes the following findings of fact, which are undisputed and "determined" by the Court based on the evidence now in the record, unless otherwise noted.[2]

R.M.B. is a 16-year-old citizen of Guatemala.  (Pet. [Dkt. 1] ¶ 10.)  In 2005, at age 6, R.M.B. entered the United States with his mother, Petitioner D.B. ("D.B." or "Petitioner"), leaving D.B.'s biological father in Guatemala. (Id. at ¶ 11; but see Pet'r's Reply [Dkt. 16] Ex. A [Dkt. 16-1] "D.B. Decl." ¶ 2 ("My son has lived with me in the United States ever since he came here when he was about nine years old.").) Once she was in the United States, D.B. remarried to T.R.  (Pet. ¶ 11; Resp'ts' Mem. [Dkt. 11] Ex. C. [Dkt. 11-3] at 1-2.)  D.B.

---

[2] As a procedural matter, there is no motion currently pending before the Court in this case.  Stated differently, Respondents did not file a motion to dismiss pursuant to Rule 12(b)(6), nor did they file a motion for summary judgment pursuant to Rule 56. Respondents do, however, oppose the requested relief in the petition for a writ of habeas corpus and ask that it be "denied," but neither party has squarely addressed the lens through which the Court should view the allegations in the petition or evidence in the record.  Pursuant to 28 U.S.C. § 2243, "[t]he court shall summarily hear and determine the facts, and dispose of the matter as law and justice require."  Both Petitioner and Respondents have submitted sworn affidavits and documentary evidence in favor of their respective positions. Neither party has requested a period of discovery, but instead, each party asks for summary disposition of the Petition. Accordingly, the Court makes the following findings of fact after considering all of the material in the record and the oral argument of counsel, just as it would if the matter were before the Court on summary judgment.

originally settled with R.M.B. and her other children in Rio
Bravo, Texas near Laredo, Texas, not far from the Texas-Mexico
border.  (D.B. Decl. ¶ 3.)  In July of 2013, D.B. moved her
family to Corpus Christi, Texas, after R.M.B. "started having
problems" in Rio Bravo.  (Id. at ¶¶ 3-4.)

It is unclear whether D.B. is a Lawful Permanent
Resident of the United States (see Pet'r's Mem. [Dkt. 2] Ex. 1
[Dkt. 2-1] at 9), or whether D.B. is in the process of attaining
Lawful Permanent Residence status as a victim of domestic
violence through the Violence Against Women Act ("VAWA") (see
D.B. Decl. ¶ 9).  Regardless, in September of 2012,
approximately seven years after arriving in the United States,
U.S. Citizenship and Immigration Services ("USCIS") approved
D.B.'s Form I-360 Petition to classify R.M.B. as a Child of a
United States Citizen or Lawful Permanent Resident.  (Pet'r's
Mem. Ex. 1 at 1.)  On February 19, 2013, USCIS decided to place
R.M.B.'s case "under deferred action, which is an administrative
choice to give some cases lower priority for removal."  (Id.)
Consequently, "USCIS [did] not anticipate instituting action for
removal at [that] time."  (Id.)

From 2011 to 2013, beginning around the age of twelve,
R.M.B. was arrested or charged numerous times with various
violations of state law, including but not limited to criminal
mischief, runaway, theft, burglary, assault, possession of

3

marijuana, assault causing bodily injury on a family member, and unauthorized use of a vehicle. (Resp'ts' Mem. Ex. D [Dkt. 11-4] at 5.) One of these charges, making a terroristic threat, was adjudicated on July 19, 2012 and R.M.B. was placed on probation. (Id.) Otherwise, the majority of these charges were dismissed. (Id.) Four charges, unauthorized use of a vehicle, violation of a court order, possession of marijuana less than two ounces, and assault causing bodily harm, remain pending. (Id. at 3.) During this same period of time, R.M.B. also began to abuse various substances. (Resp'ts' Mem. Ex. C at 4 ("When asked about substance use, [R.M.B.] reported he started using tobacco and drinking alcohol at around 10 or 11 years old. He started using marijuana and drinking alcohol heavily at 13. By age 14 he 'jumped into heroin and cocaine very heavily. [He] would smoke marijuana daily and would use heroin at least twice a week.' He was sniffing heroin because he is afraid of needles."); see also id. Ex. D at 6 ("[R.M.B.] reported he would be under the influence of drugs on a daily basis . . . [and] indicated his mother was aware he was consuming marijuana and heroin; however, she was not aware he was also using cocaine.").)

        In the fall of 2013, R.M.B. ran away from D.B.'s residence in Corpus Christi, Texas to Rio Bravo, Texas, near the Texas-Mexico border. (Resp'ts' Mem. Ex. D at 4; D.B. Decl. ¶

4

5.)  R.M.B. reported that he previously ran away from home approximately ten (10) different times, and indicated that he ran away to Rio Bravo because "he no longer wanted to live with his family and wanted to live on his own."  (Id. (stating "he did not like being at home.").  R.M.B. reportedly rented an apartment and stated that "his friend got him a job driving undocumented people from the border to different locations in McAllen, Texas."  (Id.)  Specifically, R.M.B. would "do jobs" for the Mexican Mafia, "like [] crossing illegal immigrants and bundles of drugs into the US."  (Resp'ts' Ex. C at 3-4 ("He would get paid over $100 per person and $500 per bundle of drugs, which he called 'Barbies or Munecas.'").)  R.M.B. apparently started this work at the age of fourteen but briefly stopped when he moved with the family to Corpus Christi "because there is no river there."  (Id. at 4.)  D.B. denied any knowledge of R.M.B.'s activities along the border.  (Resp'ts' Mem. Ex. D at 4.)  R.M.B. also "reported he would carry guns and he has used a gun to shoot somebody."  (Resp'ts' Ex. C. at 4.)  Specifically:

> When asked to elaborate, [R.M.B.] reported that he was once taken to a house by a gang member, Martin, and was told to shoot someone who was tied up.  "Martin told me to do it, but I did not want to.  He told me to get crazy and do a lot of drugs.  The drugs, heroin and cocaine, were on the table along with tequila.  I got crazy with the drugs and I shot the guy.  I killed him.  He fell

to the ground after I shot him.  He had a bullet right here (forehead).  Martin told me that they were going to wrap him in plastic and tie something heavy around him and throw him in the river (Rio Grande).  I got over it because it is in the past, but sometimes I feel a bit guilty.  Half of my head says that it was bad, but the other half says to keep moving forward and forget about it.  After I killed him . . . that was my initiation into the organized crime . . . this is not a gang, it is organized crime because it does not have colors or numbers.  It is about business because they call you and pay you good money to do jobs . . . . I'm not going to go down that path again because I got caught twice, and you don't fool around with the Border Patrol."  R.M.B. said.  He denied shooting or killing anyone else.

(Id.)

On or around December 15, 2013, U.S. Customs and Border Protection ("CBP") agents apprehended R.M.B. at the age of 14 years old in Rio Grande City, Texas near the Texas-Mexico border.  (Pet. ¶ 12; Resp'ts' Ex. B.)  R.M.B. stated that "he was apprehended by Border Patrol while he was waiting for a group of undocumented people near the border."  (Resp'ts' Mem. Ex. D at 4.)  CBP classified R.M.B. as an Unaccompanied Alien Child ("UAC").  (Pet. ¶¶ 12-13; Resp'ts' Ex. B.)  During his apprehension by CBP, R.M.B. called D.B. and told her that he had been stopped by immigration in Rio Grande City.  (D.B. Decl. ¶ 6.)  D.B. told R.M.B. "to remind the agent that he had VAWA."

(Id.)  At some point during the phone conversation, "all of a sudden the line went dead."  (Id. at ¶ 7.)

During the phone call, D.B. also spoke to a CBP agent, and told the agent that "both R.M.B. and [she] had VAWA and that [they] were filling out the papers and doing the other things [they] needed to do to become permanent residents."  (D.B. Decl. ¶¶ 9-10.)  D.B. "told the agent that [she] had immigration papers that would prove all of this.  He told [her] to look for them and that he would call [her] back in 15 minutes."  (Id. at ¶ 10.)  D.B. got the papers and immediately started driving to Rio Grande City.  (Id. at ¶ 11.)  After traveling about 30 to 40 miles, the CBP agent called D.B. and told her to not bother coming because "they were going to detain R.M.B. because they had found him near the river and . . . they were going to send him to a youth shelter."  (Id. at ¶¶ 12-13.)  After insisting that she had immigration papers for R.M.B., D.B. turned around and went home, fearing that the CBP would arrest her if she tried to pick up R.M.B.  (Id. at ¶ 14.)

CBP referred and transferred custody of R.M.B. to the Office of Refugee Resettlement ("ORR"), the agency within the United States Department of Health and Human Services ("HHS") charged with providing care for UACs, as defined by 6 U.S.C. § 279(g).  (Pet. ¶ 13.)  R.M.B. has remained in the custody of HHS/ORR ever since, and he has been housed in HHS/ORR facilities

in Texas, New Jersey, Florida, and Virginia.[3]   (Pet. ¶¶ 15-16.)
He currently remains in HHS/ORR's custody at the Northern
Virginia Juvenile Detention Center ("NVJDC") in Alexandria,
Virginia, a secure facility, which is operated by Respondent
Darryl Poston, Executive Director.  (Pet. ¶ 1.)

      R.M.B. has had one immigration court appearance since
his apprehension.  (Pet. ¶ 17.)  On April 15, 2015, the
immigration judge terminated the immigration proceedings against
R.M.B. because of the deferred status of D.B.'s I-360 Petition.
(Id.; Pet'r's Mem. Ex. 1 at 3.)  On May 6, 2015, USCIS extended
the deferred status of the I-360 Petition until April 6, 2016.
(Pet'r's Mem. Ex. 1 at 2.)  Nonetheless, R.M.B. remains in the
custody of Respondent Poston, at the direction of Respondent
Robert Carey, Director of ORR, and Respondent Sylvia Matthews
Burwell, Secretary of HHS.  (Pet. ¶ 1.)

---

[3] While in HHS/ORR custody, R.M.B. has repeatedly exhibited
physically aggressive, destructive, and sexually offensive
behavior.  (Resp'ts' Mem. Ex. A [Dkt. 11-1] "De La Cruz Decl." ¶
7.)  Specifically, in October of 2014, R.M.B. escaped from a
transport vehicle by freeing himself from soft restraints and
kicking out the back window of the vehicle.  (Id. at ¶ 8.)  The
same month, R.M.B. physically assaulted and possibly attempted
to sexually assault a facility staff member.  (Id. at ¶ 9.)
Additionally, R.M.B. has been in six physical altercations with
other UACs or staff members.  (Id. at ¶ 10 ("R.M.B. poured a cup
of urine and soap on roommate and later the two broke out in a
physical fight.").)  R.M.B. has also exhibited self-injurious
behaviors and suicidal ideation.  (Id. at ¶¶ 11-12.)  Due to
these behaviors, HHS/ORR has had to transfer R.M.B. on five
separate occasions, and eventually placed him in a secure
juvenile facility.  (Id. at ¶ 7.)

At some point during HHS/ORR's custody of R.M.B., D.B. formally requested that he be released to her custody. (De La Cruz Decl. ¶ 18.) On May 12, 2014, HHS/ORR formally denied D.B.'s request because R.M.B. "requires an environment with a high level of supervision and structure [and] . . . it did not appear from [HHS/ORR's] home study that [D.B.'s] home can provide the structure and supervision necessary for the safety of [her] son." (Resp'ts' Mem. Ex. G.) On March 11, 2015, D.B. requested that HHS/ORR reconsider the decision to deny the release of R.M.B. to her custody. On June 10, 2015, the Acting Assistant Secretary for Children and Families denied the request for reconsideration. (Resp'ts' Mem. Ex. H. (finding that R.M.B. should not be released due to "concerns and necessity to provide structured supervision" given his "needs and welfare.").)

On June 12, 2015, D.B. filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 with a memorandum in support on behalf of her next friend, R.M.B., requesting that the Court order R.M.B.'s release. On June 17, 2015, the Court ordered service upon the named Respondents, and ordered the Respondents to show cause why the writ should not issue, in accordance with 28 U.S.C. § 2243. (Order [Dkt. 4].) On July 17, 2015, Respondents filed a Memorandum of Law in Response to the Petition for a Writ of Habeas Corpus and asked the Court to deny the Petition. (Resp'ts' Mem. [Dkt. 11].) On July 24,

2015, Petitioner filed a reply memorandum of in support of the Petition.  (Reply Mem. [Dkt. 16].)  The Court heard oral argument of counsel on July 30, 2015.  Accordingly, the Petition is ripe for disposition.

## II. Legal Standard

"Writs of habeas corpus may be granted by . . . the district courts . . . [but] shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §§ 2241(a), (c)(3); see also Bowrin v. U.S. Immigration & Naturalization Serv., 194 F.3d 483, 487 (4th Cir. 1999) ("Since its inclusion in the Judiciary Act of 1789, § 2241 has given district courts jurisdiction to grant writs of habeas corpus to petitioners who are held in custody by the federal government in violation of the Constitution, laws, or treaties of the United States.") (citing 28 U.S.C. § 2241).  District courts have subject matter jurisdiction under 28 U.S.C. § 2241(c)(3) if (1) the petitioner is "in custody," and (2) such custody is "in violation of the Constitution or laws or treaties of the United States."  See, e.g., Maleng v. Cook, 490 U.S. 488, 490 (1989).

The district court "shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted."  28 U.S.C. § 2243.  "The person to whom the writ or order is directed shall make a return

10

certifying the true cause of the detention." <u>Id.</u>  For good

cause shown, the district court may authorize the parties to

conduct discovery.  Rule 6, Rules Governing Section 2254[4] Cases

in the United States District Courts.  Ultimately, however,

"[t]he court shall summarily hear and determine the facts, and

dispose of the matter as law and justice require."  28 U.S.C. §

2243.

### III. Analysis

#### A. Subject Matter Jurisdiction

As a threshold matter, Respondents do not contest

whether this Court has jurisdiction over the Petition.

Nonetheless, the Court does find that it has subject matter

jurisdiction.  First, the Petitioner, D.B., brings this action

under section 2241 as "the next friend" of R.M.B., a minor

child.  While "next friend" standing is not automatically

granted, the Court finds it proper in this case because R.M.B.

is a minor and D.B. is dedicated to act in his best interests.

<u>See</u> <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 163-64 (1990) (holding

the next friend must provide (1) an adequate explanation for why

the real party in interest cannot appear on his own behalf to

prosecute the action and (2) demonstrate that the next friend is

---

[4] The district court may apply any or all of these rules to a
habeas corpus petition not covered by Rule 1(a), <u>i.e.,</u> petitions
brought pursuant to 28 U.S.C. § 2241.  <u>See</u> Rule 1(b), Rules
Governing Section 2254 Cases in the United States District
Courts.

truly dedicated to the best interest of the person on whose behalf he seeks to litigate).  Second, at the time of filing, R.M.B. was in the custody of HHS/ORR and detained in NVJDC in Alexandria, Virginia, which is within this Court's jurisdiction in the Eastern District of Virginia.  See Spencer v. Kemna, 523 U.S. 1, 7 (1998).  Lastly, the Petitioner, D.B., as next friend of R.M.B., asserts that his detention is not authorized by federal statute and violates his constitutional rights.  See Bonhometre v. Gonzales, 414 F.3d 442, 445-46 (3d Cir. 2005). Accordingly, the Court has jurisdiction over the Petition.

Substantively, the Petitioner presents both statutory and constitutional claims.  First, Petitioner argues that HHS/ORR lacks statutory authority to exercise custody over R.M.B. because (1) R.M.B. allegedly never met the statutory definition of an "unaccompanied alien child" and (2) even if he did previously, HHS/ORR is now required to release R.M.B. to the Petitioner's custody after his immigration proceedings were terminated.  (Pet'r's Mem. at 2-5.)  Second, Petitioner argues that R.M.B.'s continued detention violates due process under the Constitution.  (Id. at 5-9.)  Each argument is addressed in turn.

### B. Statutory Claims

Among the many changes to federal law upon the enactment of the Homeland Security Act of 2002 ("HSA"), as is

relevant to the issues now before the Court, Congress
"transferred [to] the Director of the Office of Refugee
Resettlement of the Department of Health and Human Services
functions under the immigration laws of the United States with
respect to the care of unaccompanied alien children that were
[previously] vested [in the now-defunct Immigration and
Naturalization Service]."  6 U.S.C. § 279(a), Homeland Security
Act of 2002, Pub. L. 107296, § 462(a), 116 Stat. 2135 (Nov. 25,
2002); see also 6 C.F.R. § 279(a) (transferring to ORR the care
of UACs that was formerly performed by INS).  "This change
finally resolved the conflict of interest inherent in the former
system that pitted the enforcement side of the [INS] against the
benefits side of that same agency in the care of unaccompanied
alien children."  153 Cong. Rec. S3001, S3004 (daily ed. Mar.
12, 2007) (statement of Sen. Feinstein).  Thus, "the care and
custody of all unaccompanied alien children, including
responsibility for their detention, where appropriate, shall be
the responsibility of the Secretary of Health and Human
Services."  8 U.S.C. § 1232(b)(1).[5]  HHS/ORR is the federal
agency entrusted with the care and custody of all UACs.

        Petitioner's statutory claim rests largely on R.M.B.'s

_____

[5] Congress reauthorized this statutory scheme in 2008 by enacting
the William Wilberforce Trafficking Victims Protection
Reauthorization Act of 2002 ("TVPRA").  See Pub. L. No. 110-457,
122 Stat. 5044 (Dec. 23, 2008).

classification as a UAC.  In short, Petitioner argues that R.M.B. should have never been classified as a UAC, and even if it was appropriate to do so initially, now that immigration proceedings have been terminated, there is no statutory basis for HHS/ORR to continue to exercise custody over R.M.B.  "The standard practice of classifying an alien juvenile as 'unaccompanied' is based upon the statutory definition of 'unaccompanied alien juvenile' from the Homeland Security Act." (Pet'r's Reply Ex. J [Dkt. 16-10] "CRS Mem." at 2.)

> The term "unaccompanied alien child" means a child who:
>
> (A) has no lawful immigration status in the United States;
>
> (B) has not attained 18 years of age; and
>
> (C) with respect to whom:
>
> (i) there is no parent or legal guardian in the United States; or
>
> (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

6 U.S.C. § 279(g)(2).  It is uncontested that, both at the time of his apprehension by CBP and now, R.M.B. satisfies the first two elements of this statutory definition: he has no lawful immigration status in the United States,[6] and he has not yet

---

[6] "Deferred action does not confer any form of legal status in this country, much less citizenship, it does mean that, for a specified period of time, an individual is permitted to be

attained 18 years of age.   Thus, Petitioner asks the Court to find that R.M.B. does not satisfy the third element, as initially decided by CBP: that he has no parent or legal guardian in the United States available to provide care and physical custody.

To answer this question, the Court must look to the statutes that govern HHS/ORR's custody of UACs, and determine whether Respondents have acted in violation of these statutory directives.   To be clear, the only question before the Court, in this section, is whether R.M.B.'s custody violates federal law.   See 28 U.S.C. § 2241.   This matter is not before the Court for judicial review of the Department of Homeland Security's ("DHS") actual classification of R.M.B. as a UAC, nor is it before the Court for judicial review of HHS/ORR's denial of Petitioner's request for custody and denial of Petitioner's request for reconsideration.   As discussed below, because Respondents have acted in accordance with federal law and not in violation of it, the Court will not issue the writ on this basis.

1. HHS/ORR's Statutory Framework for UAC Custody

Aside from the special considerations given to

---

lawfully present in the United States."   Texas v. United States, 787 F.3d 733, 744 (5th Cir. 2015) (citing Memorandum from Jeh Johnson, Sec'y, Dep't of Homeland Sec., to Leon Rodriguez, Dir., U.S. Citizenship and Immigration Servs., et al., at 3-4 (Nov. 20, 2014) (the "DAPA Memo"), available at http://www.dhs.gov/sites/default/files/publications/14_1120_memo _deferred_action.pdf).

children from contiguous countries that are inapplicable here,
"the care and custody of all unaccompanied alien children,
including responsibility for their detention, where
appropriate," lies solely with HHS and ORR.  8 U.S.C. §§
1232(b)(1), (c)(1) (stating generally that HHS/ORR must develop
policies and programs to ensure that UACs "are protected from
traffickers and other persons seeking to victimize or otherwise
engage such children in criminal, harmful, or exploitative
activity . . . .").  Within 48 hours of the apprehension or
discovery of a UAC, any federal agency "shall notify the
Department of Health and Human Services."  8 U.S.C. §§
1232(b)(2)(A)-(B).  And not later than 72 hours after
determining that such a child is a UAC, the federal agency shall
transfer custody of the UAC to HHS.  8 U.S.C. § 1232(b)(3).
Notably, "[i]f neither a parent or legal guardian (with a court-
order to that effect) is with the juvenile at the time of
apprehension, or within a geographical proximity to quickly
provide care for the juvenile, the juvenile alien is classified
as 'unaccompanied.'"  (CRS Mem. at 2.)  HHS, and subsequently
ORR, relies on the federal agency's initial determination of UAC
status.  (De La Cruz Decl. ¶ 16.)

     After assuming custody of the UAC, HHS/ORR must
"promptly" place the UAC "in the least restrictive setting that
is in the best interest of the child."  8 U.S.C. §

1232(c)(2)(A).  "In making such placements, the Secretary may consider danger to self, danger to the community, and risk of flight."  Id.  HHS/ORR may place UACs "in either a detention facility or an alternative to such a facility," like foster homes.  6 U.S.C. § 279(g)(1).  Indeed, HHS/ORR places UACs in foster homes, "shelter care,"[7] "staff-secure care,"[8] and "secure care."[9]  See ORR Guide: Children Entering the United States Unaccompanied, § 1, available at: http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied (hereinafter "ORR Guide").

HHS/ORR may also place UACs with a proposed custodian. However, the UAC

> may not be placed with a person or entity unless [HHS/ORR] makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being.  Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged

---

[7] "A shelter is a residential care provider facility in which all of the programmatic components are administered on-site, in the least restrictive environment."  ORR Guide to Terms.

[8] "Staff-secure care is intended for children or youth who have engaged in disruptive behavior or criminal or juvenile offenses that may indicate a moderate risk to self or others."  ORR Guide § 1.2.4.

[9] "A secure care provider is a facility with a physically secure structure and staff able to control violent behavior.  ORR uses a secure facility as the most restrictive placement option for an unaccompanied child who poses a danger to self or others or has been charged with having committed a criminal offense."  ORR Guide to Terms; id. § 1.2.4.

> in any activity that would indicate a
> potential risk to the child.

8 U.S.C. § 1232(c)(3)(A).  In some instances, HHS/ORR must

conduct a home study for certain UACs before placing the UAC

with a proposed custodian.  8 U.S.C. § 1232(c)(3)(B).  HHS/ORR

must conduct a home study for a UAC

> who is the victim of a severe form of
> trafficking in persons, a special needs
> child with a disability [], a child who has
> been a victim of physical or sexual abuse
> under circumstances that indicate that the
> child's health or welfare has been
> significantly harmed or threatened, or a
> child whose proposed sponsor clearly
> presents a risk of abuse, maltreatment,
> exploitation, or trafficking to the child
> based on all available objective evidence.

Id.  The Court considers the facts of this case in light of this

statutory scheme.

> 2. Application to R.M.B.

When applying the facts of R.M.B.'s custody to the

statutory framework described above, the Court is also mindful

of the standard of review under section 2241 petitions.  There

is no dispute that R.M.B. is in the custody of the federal

government.  Thus, the Court need only determine whether

R.M.B.'s custody is "in violation" of the statutory scheme

above.  See, e.g., Maleng v. Cook, 490 U.S. 488, 490 (1989).

The Court answers this question in the negative and will deny

Petitioner's statutory claim.

a. Classification as an Unaccompanied Alien Child

Petitioner first argues that because "R.M.B. has always lived with his natural mother since first coming to the United States in 2005, he has never been an Unaccompanied Alien Child, as that term is defined by statute.  Accordingly, ORR has never had the authority to detain him."  (Pet'r's Mem. at 3.) While questionable as a matter of fact,[10] this argument ultimately fails because R.M.B.'s actual custody does not violate federal law.  Instead, R.M.B. is in HHS/ORR's custody in compliance with federal law.

On December 15, 2013, field officers with CBP, an agency under DHS, encountered and apprehended R.M.B. near Rio Grande City, Texas along the United States-Mexico border. (Resp'ts' Mem. Ex. B.)  R.M.B. was 14 years old at the time. (Id.)  R.M.B. told CBP field officers that he ran away from home and subsequently refused to talk to his mother, who resided in Corpus Christi, Texas, over 160 miles away from Rio Grande City. (Id.; see also Pet'r's Reply at 9 n.7)  CBP also determined R.M.B. had no legal immigration status in the United States.

---

[10] Respondents have provided ample evidence that shows not only did R.M.B. runaway from D.B.'s home on at least 10 occasions, but that at the time of his apprehension, he was not living at home and instead, had run away to the Mexican border and was living on his own and working as a smuggler for the Mexican cartel.  (See Resp'ts' Mem. Ex. C at 3, Ex. D at 4, Ex. F at 5.) Thus, it is not factually accurate to state that R.M.B. has "always lived with his natural mother since first coming to the United States in 2005."

(Id.)  Accordingly, CBP field officers determined, within their discretion, that R.M.B. met the definition of a UAC.  (Id. at ¶ 4.)

It is clear that Petitioner disagrees with DHS/CBP's determination that R.M.B. was a UAC at the time of apprehension. (Pet'r's Mem. at 2-3.)  But this disagreement is not cognizable for habeas relief under section 2241.  In short, 28 U.S.C. § 2241 is not the proper vehicle to challenge discretionary federal agency action.  Cf. 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").  Instead, under section 2241, Petitioner must show by a preponderance of the evidence that R.M.B. is in custody in violation of the laws of the United States.  In this regard, Petitioner fails to point to any statute that supports this argument.

Rather, the evidence now before the Court shows by a preponderance of the evidence that the CBP field officers, acting under the umbrella of DHS and within their discretion, classified R.M.B. as a UAC in accordance with 6 U.S.C. § 279(g)(2) after apprehending R.M.B., who, at that point in time: (1) had no lawful immigration status in the United States, see Texas v. United States, 787 F.3d 733, 744 (5th Cir. 2015); (2) had not yet attained 18 years of age, see Pet. ¶ 12; and (3)

20

with respect to whom no parent or legal guardian in the United States was <u>available</u> to quickly provide care and physical custody over R.M.B, as D.B. was over 160 miles away at the time of R.M.B.'s apprehension.  <u>Accord</u> 6 U.S.C. § 279(g)(2)(ii). D.B.'s "availability" [11] to provide care and assert physical custody over R.M.B. at the time of his apprehension is central to the dispute between the parties.  This classification, or any subsequent "final agency action," might theoretically be subject to judicial review under the Administrative Procedure Act.  <u>See</u> 5 U.S.C. § 702.  But R.M.B.'s custody that occurred as a result of this initial determination does not violate the laws of the United States, as required for relief under 28 U.S.C. § 2241.

The statutory definition of an "unaccompanied alien child" has been the center of much controversy.  This controversy is memorialized in a memorandum from the Congressional Research Service that is attached as an exhibit to D.B.'s reply brief.  (<u>See</u> Pet'r's Reply Ex. J [Dkt. 16-10] "CRS Mem.")  Therein, an official from the Congressional Research Service's Domestic Social Policy Division responded to the House Judiciary Committee's inquiry regarding the classification of

---

[11] DHS's initial classification of R.M.B. as an unaccompanied alien child implies that the CBP field officers determined that Petitioner was "not available" to provide care and physical custody to R.M.B. at the time of his apprehension.  This discretionary determination is not subject to review by this Court under section 2241, for the reasons discussed below.

unaccompanied or accompanied alien children.  (Id. at 1.)  The
memorandum clarified classification procedures and discussed
standard practices, recognizing that as is relevant here,
federal agencies are afforded discretion under the statutory
scheme when classifying juveniles as unaccompanied alien
children.  Specifically,

> DHS officials maintain that when a CBP
> officer arrests a juvenile, the officer has
> some discretion to either take the juvenile
> into federal custody, allow the child to
> voluntarily return across a border [if
> applicable], or release the juvenile to an
> adult relative in the United States.
> However, it is mostly the case that a
> juvenile apprehended at the border is taken
> into federal custody by the CBP field
> officer.

(Id. at 4 (emphasis added).)  This discretionary action by CBP
officials forms the substance of Petitioner's statutory claim:
CBP officials erroneously classified R.M.B. as an unaccompanied
alien child, and therefore, his custody allegedly violates
federal law.  "However, § 2241 does not say that habeas is
available to challenge purely discretionary (yet arguably
unwise) decisions made by the executive branch that do not
involve violations of the Constitution or federal law."
Gutierrez-Chaves v. Immigration & Naturalization Serv., 298 F.3d
824, 827 (9th Cir. 2002); see also Bowrin v. U.S. Immigration &
Naturalization Serv., 194 F.3d 483, 490 (4th Cir. 1999).
Indeed, all circuits to consider the proper scope of review for

2241 petitions filed by aliens challenging removal orders "have concluded that habeas review of administrative factual findings or the exercise of discretion is impermissible."  Cadet v. Bulger, 377 F.3d 1173, 1184 (11th Cir. 2004) (citing Bakhtriger v. Elwood, 260 F.3d 414, 425 (3d Cir. 2004); Bravo v. Ashcroft, 341 F.3d 590, 592 (5th Cir. 2003); Gutierrez-Chaves, 298 F.3d at 829-830, amended by, 337 F.3d 1023; Carranza v. Immigration & Naturalization Serv., 277 F.3d 65, 71-73 (1st Cir. 2002); Sol v. Immigration & Naturalization Serv., 274 F.3d 648, 651 (2d Cir. 2001); Bowrin, 194 F.3d at 490).

Even though Gutierrez-Chaves is factually distinguishable from the facts of this case, the legal proposition gleaned from that case, and from Bowrin, is applicable here.  Quite simply,

> [h]abeas is available to claim that the [federal agency] somehow failed to exercise discretion in accordance with federal law or did so in an unconstitutional manner.  But habeas is not available to claim that the [federal agency] simply came to an unwise, yet lawful, conclusion when it did exercise its discretion.

Gutierrez-Chaves, 298 F.3d at 828; see also Bowrin, 194 F.3d at 490 ("Only questions of pure law will be considered on § 2241 habeas review.  Review of factual or discretionary issues is prohibited.").  This distinction under section 2241 is narrow. While Petitioner cannot use section 2241 habeas relief to obtain

review of the CBP's discretionary classification of R.M.B. as an Unaccompanied Alien Child, Petitioner's claim that the discretionary process itself was constitutionally flawed is cognizable in district court on habeas review because such a claim fits within the scope of section 2241.  Gutierrez-Chaves, 298 F.3d at 829.  Those claims are discussed infra, section III.C.

Moreover, once R.M.B. was classified as a UAC by CBP field officers, in accordance with federal law, HHS/ORR cannot release R.M.B. to the custody of another individual, including D.B., unless HHS/ORR "makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being."  8 U.S.C. § 1232(c)(3)(A).  And indeed, HHS/ORR has complied with this statutory provision and with 8 U.S.C. § 1232(c)(3)(B) by conducting a Home Study for Petitioner to determine whether Petitioner is capable of providing for his physical and mental well-being.  (Resp'ts' Mem. Ex. D.) Additionally, R.M.B underwent a psychological evaluation and psychosexual evaluation.[12]  (Id. Exs. F, G.)  The Home Study and

---

[12] The Court need not address these evaluations, as they are not required by statute, unlike the Home Study.  Needless to say, however, the results of the evaluations are disturbing, and support the conclusion that R.M.B.'s current needs can only be met in a secure setting, which Petitioner cannot currently provide.  (See Resp'ts' Mem. Ex. C ("R.M.B. is a very troubled and violent young man who is struggling with chronic depressive tendencies, an unstable and unpredictable sense of self,

psychological evaluations reach the same conclusion: R.M.B.

requires a very restrictive and secure living environment, and

the Petitioner is not capable of providing for his well-being at

this time.[13]

Ultimately, in accordance with 8 U.S.C. §

1232(c)(3)(B), HHS/ORR concluded that Petitioner "clearly

---

hypervigilance, high levels of impulsivity and anger, severe
substance abuse and a complete disregard for basic social norms
or laws."); Ex. F (concluding R.M.B. "should not live at home or
reside in a home where there are children three years younger
than him.  He should only have supervised contact with his
siblings or any other child . . . [due to] possible engagement
in homicidal behaviors, association with gang members, inability
to manage his anger and impulsivity and lengthy substance abuse
history . . . .").)

[13] Specifically, on March 4, 2014, HHS/ORR completed a Home
Study, again in accordance with federal law, 8 U.S.C. §
1232(c)(3)(B), to determine whether R.M.B. could be released to
the Petitioner's custody.  (Resp'ts' Mem. Ex. D.)  Notably, in
March of 2013, Petitioner was charged with child endangerment
and abandonment.  (De La Cruz Decl. ¶ 18.)  At that time, her
children, including R.M.B., were temporarily removed from her
care.  (Id.)  Petitioner also admitted to being in an abusive
relationship with T.R., R.M.B.'s stepfather.  (Id.)  After a
thorough investigation, despite the fact that her children were
eventually returned to her by child protective services, and
despite Petitioner's willingness to care for R.M.B., HHS/ORR
concluded that placement with Petitioner was not appropriate at
that time because: (1) Petitioner's home was not a safe and
stable environment due to Petitioner's abusive relationship with
R.M.B.'s stepfather; (2) R.M.B. has an extensive criminal
history, and a history of substance abuse; (3) R.M.B. has an
active warrant for his arrest; (4) Petitioner was unable to
provide a safety plan for R.M.B.; and (5) R.M.B. previously
demonstrated defiant behavior while in HHS/ORR's custody.  (Id.
at 13.)  One week later, on March 11, 2014, an independent
third-party concurred with this recommendation, "based on the
concerns of domestic violence, [R.M.B.'s] criminal charges,
[R.M.B.'s] substance abuse, and the overall needs of both R.M.B.
and his family, [concluding] it does not appear that a safe
release can be made at this time."  (Resp'ts' Mem. Ex. E at 5.)

presents a risk of abuse, maltreatment, exploitation, or trafficking to the child based on all available objective evidence."  (De La Cruz Decl. ¶ 18.)  On March 12, 2014, HHS/ORR formally denied Petitioner's application for custody of R.M.B. (Resp'ts' Mem. Ex. G.)  After Petitioner requested reconsideration, on June 10, 2015, the Acting Assistant Secretary for Children and Families denied Petitioner's reconsideration request due to "concerns and necessity to provide structured supervision," among other issues presented in the Home Study.  (Id. Ex. H.)  In short, with regard to Petitioner's first statutory argument, Petitioner fails to demonstrate, by a preponderance of the evidence, that Respondents' custody of R.M.B. violates any federal law. Indeed, the only statutory provision that Petitioner cites in this regard is 6 U.S.C. § 279(g)(2), the definition of an unaccompanied alien child, which again illustrates that Petitioner contests the Respondents' discretionary classification of R.M.B. as a UAC.[14]  But this argument does not

---

[14] Petitioner also cites Coreas-Giron v. Holder, 422 F. App'x 602, 603 (9th Cir. 2011) (citing 6 U.S.C. § 279(g)(2)(C)(ii)) for the proposition that the minor child at issue in that case did not meet the statutory definition of a UAC because he lived with his mother in the United States.  This case is distinguishable factually and legally.  First, in that case, the minor was actually living with his mother, unlike R.M.B. who was unaccompanied and living on his own by the Mexican border at the time of his apprehension.  Second, this case involved asylum petitions and not HHS/ORR's custodial requirements for such

prove that R.M.B. is currently in custody in violation of federal law.  Thus, Petitioner's first statutory argument fails to state a proper claim for relief under 28 U.S.C. § 2241 and the Petition will be denied on this basis.

b. Effect of Termination of Immigration Proceedings

Next, Petitioner argues that because the removal proceedings against R.M.B. have been terminated, his continued immigration detention is unlawful and he must be released. (Pet'r's Mem. at 3-5.)  As support for this argument, Petitioner contends that the federal government can only detain a person in immigration custody pursuant to a warrant and pending adjudication of that person's removability.  (Id. at 3 (citing 8 C.F.R. § 236.1(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States.").)  Petitioner's argument in this regard relies on a false premise, i.e., that R.M.B. is in "immigration detention."  For the following reasons, the Court will also deny the Petition on this basis.

R.M.B. is not in "immigration detention," as Petitioner contends.  As discussed at length above, R.M.B. is in the custody of HHS/ORR, a federal agency that has no

---

children.  Accordingly, it does not impact the Court's analysis or this outcome.

<u>responsibility</u> for adjudicating the immigration status of any individual.  <u>See</u> 6 U.S.C. § 279(c).  Instead, R.M.B.'s classification as a UAC has resulted in his HHS/ORR custody. And the statutory framework precludes HHS/ORR from releasing R.M.B. to the custody of <u>any</u> individual unless it determines that the proposed individual "is capable of providing for the child's physical or mental well-being."  8 U.S.C. § 1232(c)(3)(A).  Notably, in 2002, by enacting the HSA, Congress intentionally separated HHS/ORR from any immigration considerations or decisions.  <u>See</u> 153 Cong. Rec. S3001, S3004 (daily ed. Mar. 12, 2007) (statement of Sen. Feinstein) ("This change finally resolved the conflict of interest inherent in the former system that pitted the enforcement side of the [INS] against the benefits side of that same agency in the care of unaccompanied alien children.").

As the statute expressly recognizes, in an effort to combat child trafficking and exploitation in the United States, "the care and custody of all unaccompanied alien children . . . shall be the responsibility of the Secretary of Health and Human Services."  8 U.S.C. § 1232(b)(1).  And most importantly, nothing in the statutory scheme at issue "may be construed to transfer the responsibility for adjudicating benefit determinations under the Immigration and Nationality Act (8 U.S.C. § 1101 <u>et</u> <u>seq.</u>) from the authority of any official of the

28

Department of Justice, the Department of Homeland Security, or the Department of State."   6 U.S.C. § 279(c).   In other words, when read together, the statutory framework tasks HHS/ORR primarily with caring for and assuming custody over UACs; all immigration adjudications remain with DOJ, DHS, or the State Department.

Again, under 28 U.S.C. § 2241, Petitioner must show that R.M.B.'s custody violates federal law.   Petitioner fails to show, by a preponderance of the evidence, that the termination of R.M.B.'s removal proceeding somehow causes HHS/ORR's custody over R.M.B. to violate federal law.   Because HHS/ORR's continued custody over R.M.B. is in accordance with the statutory framework designed by Congress, the Court will deny the Petition on this basis as well.

C. Constitutional Claim

Lastly, Petitioner contends that HHS/ORR's continued custody of R.M.B. violates R.M.B.'s substantive and procedural due process rights under the Fifth Amendment to the Constitution.   (Pet. at 5; Pet'r's Mem. at 5-9.)   The Court disagrees in light of the Supreme Court's holding in Reno v. Flores, 507 U.S. 292 (1993).   The Supreme Court decided this case before Congress enacted the HSA in 2002, and thus, the Court scrutinized the now-defunct statutory and regulatory scheme promulgated by the now-defunct INS that governed the

29

release and custody of alien juveniles.  However, the reasoning

from Flores regarding substantive and procedural due process

extends to the statutory scheme at issue in this case and

HHS/ORR's custody of unaccompanied alien children.

In Flores, juvenile aliens who were detained on

suspicion of being deportable challenged the INS regulation that

provided for release only to their parents, close relatives, or

legal guardians, except in unusual and compelling circumstances.

Id. at 294-99.  Under the regulation, juvenile aliens who were

not released under the above conditions were placed in juvenile

care facilities.  Id.  The juvenile aliens argued under the

Constitution and immigration laws that they had a right to be

routinely released into the custody of other "responsible

adults."  Id.  Specifically, as relevant here, the juvenile

aliens made two arguments: (1) they had a "fundamental right to

freedom from physical restraint" and it was a denial of

"substantive due process" to detain them because the INS "cannot

prove that it [was] pursuing an important government interest in

a manner narrowly tailored to minimize the restraint on liberty"

and (2) the regulation violates "procedural due process, because

it does not require the [INS] to determine, with regard to each

individual detained juvenile who lacks an approved custodian,

whether his best interests lie in remaining in INS custody or in

release to some other 'responsible adult.'"  Id. at 299-300.

First, the Supreme Court determined that the right at issue was "the alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than a government-operated or government-selected child-care institution." Id. at 302. The Court noted the novelty of the issue, and ultimately held that the INS regulation did not deprive the juvenile aliens of "substantive due process." Flores, 507 U.S. at 304-305. The Court found that the government's humane custody of juvenile aliens with no available parent, close relative, or legal guardian was rationally connected to promoting the general welfare of the child. Id. at 303 (citation omitted). Moreover, in the context of alien children, the Court recognized the judiciary's deferral to the political branches of the federal government. Id. at 305 ("For reasons long recognized as valid, the responsibility of for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.") (quoting Matthews v. Diaz, 426 U.S. 67, 81 (1976)). Indeed, "over no conceivable subject is the legislative power of Congress more complete." Flores, 507 U.S. at 305 (quoting Fiallo v. Bell, 430 U.S. 787, 792 (1977) (additional citations omitted)).

Here, the facts are slightly different, in that D.B., R.M.B.'s mother, argues that she is both available and willing to care for R.M.B., and that by refusing to release R.M.B. into her custody, the federal government is interfering with her fundamental liberty interest in having custody of her child. (Pet'r's Reply at 11–12 (citing Troxel v. Granville, 530 U.S. 57, 65 (2000) ("[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court.")).) But the federal government has determined, in its discretion and either rightly or wrongly, but in accordance with statute, that R.M.B. is an alien child that has no available parent.  Thus, the right at issue here is more properly characterized as the alleged right of an alien child who has no available parent, close relative, or legal guardian, as determined by the federal government, and for whom the government is responsible, to nonetheless be placed in the custody of his parent, who cannot, at this time, properly care for his mental and physical needs. This cannot be characterized as a fundamental right.  See Flores, 507 U.S. at 305 ("The impairment of a lesser interest (here, the alleged interest in being released into the custody of strangers) demands no more than a 'reasonable fit' between governmental purpose (here, protecting the welfare of the juveniles who have come into the Government's custody) and the

means chosen to advance that purpose."). And it is entirely reasonable for the federal government to advance the interest of protecting the welfare of R.M.B., a minor now within its custody. The record is replete with factual bases for why R.M.B. cannot be released to D.B.'s custody at this time, and they need not be repeated here. There are also no other suitable custodial arrangements available for R.M.B. at this time, based on his needs. See id. at 302 ("[J]uveniles, unlike adults, are always in some form of custody, and where the custody of the parent or legal guardian fails, the government may (indeed, we have said must) either exercise custody itself or appoint someone else to do so.") (quoting Schall v. Martin, 467 U.S. 253, 265 (1984)). Ultimately, Flores controls this outcome, and for these reasons, the Court holds that the statutory scheme does not deprive Petitioner of "substantive due process." Id. at 300-306.

Second, the Supreme Court held that the juvenile aliens' demand for an individualized custody hearing was merely the "substantive due process" argument recast in procedural terms, and that existing INS procedures were sufficient to satisfy "procedural due process." Id. at 307-309. Specifically, the Court found that due process was satisfied by giving the detained alien juveniles the right to a hearing before an immigration judge. Id. at 309.

Here, R.M.B. was afforded the same right to a hearing before an immigration judge, where his immigration proceedings were terminated.  And in 2002, Congress separated the immigration enforcement mechanism from the care and custody of unaccompanied alien children, which now rests solely with HHS/ORR, an agency that has no involvement in immigration matters.  D.B. completed the procedural administrative process in an attempt to gain custody of R.M.B., in accordance with federal statute.  HHS ultimately denied her request, both initially and upon reconsideration, which presumably is subject to deferential judicial review under the APA.  See 5 U.S.C. § 702.  Thus, the Court finds that from a procedural due process perspective, the mechanism currently in place satisfies any constitutional scrutiny.  Therefore, the Court will also deny the Petition on this basis.

It is worth noting that Petitioner raises a valid argument regarding the historical abstention of federal courts from deciding and meddling into matters of domestic relations or family law.  (See Pet'r's Reply at 17-18 (quoting In re Burrus, 136 U.S. 586, 593-94 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States.").)  However, R.M.B. came to the attention of--and eventually found himself in the custody of--the federal government due to his

34

age, immigration status, and unaccompanied status.  "[I]n the exercise of its broad power over immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.'"  Flores, 507 U.S. at 305-306 (quoting Fiallo, 430 U.S. at 792 (quoting Mathews v. Diaz, 426 U.S. 67, 79-80 (1976))). Congress made explicit its choice to separate the enforcement mechanisms of USCIS and the care of unaccompanied alien children with HHS/ORR when it enacted the HSA in 2002.  Regardless, R.M.B.'s immigration status in this country ultimately factored into his current custody with HHS/ORR, and this Court recognizes the overriding and broad power afforded to the legislative branch regarding issues of immigration.  In sum, the Court views this case through the lens of immigration and habeas law, rather than "domestic custody issues" as framed by Petitioner.  Accordingly, the Court finds nothing unconstitutional in this regard either.

### IV. Conclusion

For the foregoing reasons, the Court will deny the Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241.

An appropriate Order shall issue.


|                        | /s/                                 |
|------------------------|-------------------------------------|
| August 5, 2015         | James C. Cacheris                   |
| Alexandria, Virginia   | UNITED STATES DISTRICT COURT JUDGE  |