1

1       UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF VIRGINIA
2          ALEXANDRIA DIVISION

3
DORA BELTRAN, AS NEXT FRIEND OF)
4  R.M.B., A MINOR              )
                               )
5                              )
      VS.                      )  1:15-CV-745   JCC/JFA
6                              )
                               )  ALEXANDRIA, VIRGINIA
7                              )    JULY 30, 2015
                               )
8  DARRYL POSTON, *ET AL.*      )
   _____)
9

10

11

12

13
    _____
14
              **TRANSCRIPT OF MOTION HEARING**
15    **BEFORE THE HONORABLE JAMES C. CACHERIS**
              **UNITED STATES DISTRICT JUDGE**
16  _____

17

18

19

20

21

22

23

24  **Proceedings reported by stenotype, transcript produced by**

25  **Julie A. Goodwin.**

2

1                    **A P P E A R A N C E S**

2

3   FOR THE PETITIONER:
         LEGAL AID JUSTICE CENTER
4        By:  MR. SIMON SANDOVAL-MOSHENBERG
         6066 Leesburg Pike
5        Suite 520
         Falls Church, Virginia  22041
6        703.720.5605
         simon@justice4all.org
7

8        TEXAS RIOGRANDE LEGAL AID, INC.
         By:  MS. SUSAN L. WATSON, *Pro Hac Vice*
9        311 Plus Park
         Suite 135
10       Nashville, Tennessee  37217
         615.750.1203
11       swatson@trla.org

12

13  FOR THE FEDERAL RESPONDENTS:
14       UNITED STATES ATTORNEY'S OFFICE
         By:  MR. DENNIS C. BARGHAAN, JR.
15       Assistant U.S. Attorney
         2100 Jamieson Avenue
16       Alexandria, Virginia  22314
         703.299.3700
17       dennis.barghaan@usdoj.gov

18
         UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES:
19       By:  MS. JUDY HARON, ESQ.
         Office of General Counsel
20       Children, Families and Aging Division

21

22  OFFICIAL U.S. COURT REPORTER:
23       MS. JULIE A. GOODWIN, CSR, RPR
         United States District Court
24       401 Courthouse Square
         Tenth Floor
25       Alexandria, Virginia  22314
         512.689.7587

3

1    (JULY 30, 2015, 10:56 A.M., OPEN COURT.)

2         THE COURT:  *Beltran versus Poston, et al.*

3         MR. BARGHAAN:  Good morning, Your Honor.  Assistant

4    United States attorney Dennis Barghaan on behalf of federal

5    respondents.  With me at counsel's table today is Judy Haron,

6    who's a counsel with the Department of Homeland -- Homeland --

7    Department of Health and Human Services.

8         THE COURT:  Glad to have her with us.

9         MR. SANDOVAL-MOSHENBERG:  Good morning, Judge.  Simon

10   Sandoval-Moshenberg, Legal Aid Justice Center, Falls Church,

11   Virginia.  With me is my colleague, Susan Watson, who's *pro hac*

12   *vice* has been approved from Texas RioGrande Legal Aid --

13        THE COURT:  Glad to have her with us.

14        MR. SANDOVAL-MOSHENBERG:  --  here on behalf of

15   petitioner.

16        MS. WATSON:  Good morning, Your Honor.

17        MR. SANDOVAL-MOSHENBERG:  Judge, I'll be arguing the

18   motion to strike.  Ms. Watson will be arguing the merits --

19        THE COURT:  I'll take the motion to strike first.

20        Let me ask you this.  Obviously this case requires

21   an opinion.  Is it all right if I just use the initials of Ms.

22   Beltran?

23        MS. WATSON:  That's fine, Your Honor.

24        THE COURT:  As next friend of R.M.B., a minor,

25   whatever.  Yeah, that way -- such an important case that needs

4

1  a published opinion, anyhow.

2          MS. WATSON:  Thank you, Your Honor.

3          THE COURT:  All right, sir.

4          MR. SANDOVAL-MOSHENBERG:  Thank you, Judge.

5          THE COURT:  Mr. Moshenberg.

6          MR. SANDOVAL-MOSHENBERG:  Judge, as a preliminary

7  matter, I must mention that our central contentions litigation

8  is that ORR lacks the power to detain.  On that legal theory,

9  the James De La Cruz declaration is actually not relevant at

10  all to that question one way or the other.

11         Our second contention, though, of course on the

12  merits, is that R.M.B. is not and never was an unaccompanied

13  alien child, or UAC.  And for that, the question is whether the

14  mother was, quote, available.  That's the word in the statute

15  that's relevant.

16         So on that, the De La Cruz declaration is at best

17  relevant as circumstantial evidence as to whether the mother

18  was available within the meaning of the statute.  And here, I'm

19  referring specifically to paragraphs 3 and 4 which are the

20  paragraphs of the declaration which purport to describe what

21  happened, the interaction between Customs and Border Patrol,

22  CBP, and R.M.B. down in Rio Grande City, Texas.  So the

23  question really central for this motion to strike is are those

24  two paragraphs admissible.

25         Now the Government is pointing to 803(6), the

1    business records hearsay exception, but that's -- 6(D) is not

2    met.  6(D) requires for a business record that there be

3    testimony of the custodian or another qualified witness or a

4    certification that complies with Rule 902 or a statute

5    permitting certification.

6           That hasn't been met by James De La Cruz, and it

7    can't possibly be met by James De La Cruz because Mr. De La

8    Cruz is with ORR, which is a sub-agency of HHS.  CVP, of

9    course, is a completely other kind of a department.  It's a

10   sub-agency of DHS.

11          Now the Government provides a number of cases on

12   page 4 of its opposition, arguing that essentially this is a

13   30(b)(6) declaration by Mr. De La Cruz.  And they point to a

14   bunch of cases, but every single one of those cases arises on

15   the posture of a summary judgment motion under Federal Rule of

16   Civil Procedure 56.

17          Now Federal Rule of Civil Procedure 56 has its own

18   admissibility standard which is 56(c).  And 56(c) essentially

19   says if it -- if it could be presented in a form that would be

20   admissible in evidence, you can have a 30(b)(6) declarant to

21   that effect.  5062, a party may object at the material cited to

22   support or dispute a fact cannot be presented in a form that

23   would be admissible in evidence.

24          But that's very different evidentiary standard from

25   when the Court is finally called upon to decide the facts of

6

1    the matter on the merits.  Right?  At trial you can't present

2    hearsay evidence and then say, well, I could have brought the

3    actual initial declarant.  I could have brought non-hearsay

4    evidence, so it's okay that I'm presenting this hearsay

5    evidence.  At trial, the hearsay evidence is simply not

6    admissible even though it hypothetically could be presented in

7    some non-hearsay way.

8          So it's quite clear that just because a corporate

9    designee can say something in a 30(b)(6) deposition or an

10   affidavit, it doesn't mean that the same human being can

11   necessarily testify to that fact once the Court is finally

12   called upon to decide the merits of the case and decide what

13   facts are true and what facts are false.  Right?

14         I mean, a company can designate its janitor as a

15   30(b)(6) designee as long as the janitor studies up by

16   reviewing the relevant business records.  It doesn't mean that

17   the janitor can come to trial, testify as to the contents of

18   those business records, lay the foundation to get those

19   business records into evidence.

20         And then finally, Judge, the last thing I'd like to

21   mention is the Government cited to -- a case out of this court,

22   Judge Ellis, *In Re: Outside Wall Tire Litigation*.  I think that

23   case is actually quite helpful because in that case Judge Ellis

24   found that in litigation between private parties, essentially,

25   a patent and trademark PTO file was not admissible as a

1  business record because the statements by the PTO examiner were

2  considered inadmissible hearsay and thus couldn't be offered

3  for the truth of the matter.

4          So here, obviously, this is not litigation between

5  private parties, but it's litigation between an individual and

6  ORR.  What we have is an ORR declarant purporting to tell us

7  what happened at the scene on the street where no one from ORR

8  was even there.  Right?  It was a CBP agent that was there.

9          The Government correctly pointed out that we did

10  not move to strike Exhibit B.  I'm going to eat a little bit of

11  crow for that, Judge, but I'm here -- now that we are here on

12  the habeas petition, you know, I'm here to object in open court

13  to the admissibility of Exhibit B as well on -- on hearsay

14  grounds.

15          Thank you, Judge.

16      THE COURT:  Okay.  Let me just say before I hear from

17  Mr. Barghaan, I've got a judge's meeting at 11:30, so I'll have

18  to recess then and pick you up depending on what arguments you

19  have left.

20          Go ahead, Mr. Barghaan.

21      MR. BARGHAAN:  Your Honor, I'll be very quick on this.

22  I think this is a completely a mountain out of a molehill.

23          Mister -- Mr. Sandoval mentions that this is a

24  quite -- quite correctly notes that this is litigation against

25  ORR.  As we said in our paper, this Court asked ORR in its

8

1   order, the only two peop -- the only two entities of the

2   federal government named are HHS and ORR by their own design.

3   They -- this Court asked those two entities to -- to explain

4   why the writ ought not issue.  And so the De La Cruz

5   declaration, as we note, is an attempt much like Rule 30(b)(6)

6   which, as Mr. Sandoval also concedes, is appropriate on paper

7   submissions in a summary judgment-like context which is --

8   which is much like what's going on here, to provide this Court

9   with the reasons for which ORR is continuing its custody of

10  R.M.B.  That's all that's going on here.

11          In fact, Your Honor, it's quite ironic that we see

12  this motion to strike because the very reason that ORR exists

13  outside of DHS and CBP in the first instance is to separate

14  those two entities so that you have ORR relying on things that

15  CBP has told them, but they make their own decisions about

16  detention and custody more generally.

17          Because it is akin to a Rule 30(b)(6) declarant and

18  because there is no motion to strike before the Court on

19  Exhibit B, which is the document on which Mr. De La Cruz

20  premises the majority of those two paragraphs, the only two

21  paragraphs that Mr. Sandoval articulates here today, the Court

22  should deny the motion.

23          Thank you.

24          THE COURT:  Okay.  Anything else?

25          MR. SANDOVAL-MOSHENBERG:  No, Judge.  Thank you.

1          THE COURT:  I'm going to take it under advisement.

2              Okay.  Let's go to the merits of the habeas corpus

3   motion.

4              Ms. Watson, what do you think the standard of

5   review is on this?

6          MS. WATSON:  On the habeas petition?

7          THE COURT:  Yes, ma'am.

8          MS. WATSON:  A preponderance of the evidence.

9          THE COURT:  Okay.

10         MS. WATSON:  It's a civil matter before the Court,

11  Your Honor.

12         THE COURT:  Very well.  Go ahead.

13         MS. WATSON:  I'd like to begin by thanking the Court

14  for allowing me to appear.  It's a great honor to be here in

15  Virginia with you today.  And I'd also like to clarify for our

16  reporter, who I see, with our alphabet soup.

17             When I refer to CBP, that's of course Customs and

18  Border Protection which is an agency within the Department of

19  Homeland Security, and ORR as the Office of Refugee

20  Resettlement within the Department of Health and Human

21  Services.

22         THE COURT:  I think Ms. Egal will find that very

23  helpful.

24             Go ahead.  As I will.  Go ahead.

25         MS. WATSON:  I know that the Court has an obligation

1   soon, and this matter has been well briefed before the Court.

2   I will restrict my comments to the essence of why we're here

3   today and make clear, as we hopefully did in our traverse and

4   in the petition itself that this is a petition for a writ of

5   habeas corpus.  It is a petition asking this Court to decide

6   whether the federal government has the authority, the power,

7   any legal basis for continuing the detention of a minor who was

8   arrested by federal immigration officials, who was placed in

9   detention by virtue of that immigration arrest.  Was eventually

10  for some unexplained reason a year and a half later eventually

11  presented to an immigration judge who then terminated those

12  removal proceedings that have the effect of canceling the

13  underlying warrant that gives rise to the detention in the

14  first place by operation of law.

15          That is not in dispute.  The Government does not

16  dispute those, either those facts that he was arrested by

17  immigration officials, that he was detained pursuant to that

18  immigration arrest, that the termination was issued by an

19  immigration judge, and the effect -- the legal effect of that

20  termination.  It's not addressed anywhere in their response.

21  That alone should be dispositive.

22          There is no distinction in the Immigration and

23  Nationality Act, which is the INA, or in the 8 CFR, which are

24  the regulations enacting the federal -- the Immigration and

25  Nationality Act, that distinguish the legal effect of

1  termination of proceedings between adults and children or

2  accompanied children and unaccompanied children.

3         We, of course, also contend that he's wrongfully

4  detained because he is not now and has never been an

5  unaccompanied alien child, as that term is defined in 6 U.S.C.

6  279(g)(2), I believe, which has two requirements that there be

7  a present -- a parent present in the United States and that

8  parent be available.

9         THE COURT:  His mother was both.

10         MS. WATSON:  Correct, Your Honor.  And it is our

11  contention that it's both.  And whether that decision was made

12  in error by the CBP official, whether it was coerced in nature

13  is perhaps a different question for --

14         THE COURT:  Wasn't she about 150 miles away from him

15  when he was first detained?

16         MS. WATSON:  That's -- that's about the right

17  distance, Your Honor.

18         THE COURT:  Yeah.

19         MS. WATSON:  She was in Corpus Christi and he was in

20  Rio Grande City.

21         THE COURT:  And she started across and then they told

22  her --

23         MS. WATSON:  She started to come get -- she -- they

24  told her to get his --

25         THE COURT:  Turn around.

1        MS. WATSON:  Because he had already been granted -- as

2    a victim of domestic violence, she had applied for herself and

3    her children, including R.M.B., for immigration relief in

4    administrative proceedings, not in judicial court removal

5    proceedings, but making an affirmative petition for immigration

6    relief through the United States Citizen and Immigration

7    Service as a victim of domestic violence.  And that's under the

8    Violence Against Women Act, which is VAWA.

9        THE COURT:  Let me ask you this because, you know, you

10   read the reports.  This youth, this young man, has really been

11   troubled.  I mean, he's really had a lot of problems, and he

12   ended up as a coyote bringing people into the U.S. dealing with

13   gangs and whatever.

14       MS. WATSON:  That's all been alleged, I would point

15   out, Your Honor.  There's not a single criminal charge;

16   certainly no federal charge pending against all of those.

17       THE COURT:  Also claimed in one of these things if

18   true that he shot somebody too.

19       MS. WATSON:  Again, there's nothing in the record to

20   indicate that that's a true statement or that he ever retracted

21   that statement, which he tells me he has.

22       THE COURT:  Okay.  Go ahead.

23       MS. WATSON:  But again, as Your Honor pointed out,

24   there's a lot of things that the agency says he said.  We

25   haven't seen any of that.  He certainly hasn't been allowed any

1   contact with his mother.  Ten minutes a day -- ten minutes

2   twice a week.

3          But back to my original point that the -- actually

4   the second point, in addition to having the proceedings

5   terminated, he's not ever been subject to ORR authority or

6   detention as an unaccompanied alien child.  And so any

7   authority that they do have over unaccompanied minors who are

8   in proceedings do not apply to him.

9          And finally, of course, we argue that his detention

10  violates due process.  He has not been -- he doesn't have any

11  meaningful ability to appeal short of this habeas petition, his

12  current detention, that he is in custody, as the Government

13  contends.  And a child custody sort of way is just absolutely

14  false.  There's no child custody case pending anywhere

15  regarding this child, certainly not with ORR as a party in

16  that -- in a child custody litigation.

17         And with all due respect to the Court, the federal

18  courts lack jurisdiction to enter that kind of determination.

19  Whether ORR is in a better position to -- to care for troubled

20  youths or immigrant youths or whether his mother is, those are

21  questions that are left exclusively to the state courts.  And

22  in this case, the state court has already decided that it is in

23  R.M.B.'s best interest, as well as that of his siblings, to

24  reside with his mother, his natural, conservator under state

25  law.

1    And we'll hear a lot from the Government, I

2 suspect, as we did in their papers, that whether he is a

3 troubled kid.  The extent of that trouble, I would subject, is

4 not even relevant.  It's clearly important, and the mother

5 recognizes it's important, and I don't think that either the

6 mother or the child would deny that he's had problems.  But at

7 the end of the day that is the mother's -- a parent's

8 responsibility to determine how to best handle.

9    There is nothing in the federal law that grants the

10 federal government to step in *in loco parentis* for any child

11 who is no longer lawfully in federal custody.  The language of

12 their enabling statute, which is the -- their basis, they

13 contend, for being able to exceed the -- to continue to make

14 custody decisions for this child, child custody decisions, also

15 expressly limits the scope and the duration of their

16 responsibilities and obligations to immigrant children who are

17 detained by reason of their federal immigration status.

18    We've had a ruling.  This is very -- as tragic as

19 it is and as troubling as it is on many levels, it's actually a

20 fairly straightforward question, and that is what legal

21 authority does the Government have to continue to detain this

22 child in immigration detention?  And the answer is none, and

23 the writ should issue.

24    THE COURT:  Very well.

25    MS. WATSON:  Thank you, Your Honor.

1          THE COURT:  Mr. Barghaan.

2          MR. BARGHAAN:  Yes, Your Honor.

3          THE COURT:  I'll let you answer the last point Ms.

4    Watson made about jurisdiction.

5          MR. BARGHAAN:  The jurisdiction in what respect, Your

6    Honor?  My apologies.

7          THE COURT:  Well, to detain the child.

8          MR. BARGHAAN:  The Trafficking Victims Protection

9    Reauthorization Act of 2008 provides at 12 -- Section 1232(c)

10   of Title 8 that whenever a child is in the custody of ORR, ORR

11   may not relinquish that custody to any individual unless they

12   can -- or entity, for that matter, unless they can assure

13   themselves that the custodian in question - here the

14   petitioner - can take care of the mental and physical

15   well-being of the child and would not pose a risk to the child.

16   That is as the written decisions that have been provided on

17   petitioner's request provide are well-documented as to why ORR

18   made an adverse decision in that respect.

19          Before I begin with any other comments that I have,

20   and I promise despite my typical longwinded nature that the

21   Court will be done with --

22          THE COURT:  I've read the briefs in the case.

23          MR. BARGHAAN:  Absolutely, Your Honor.

24          I want to -- I do want to thank my co-counsel in

25   this case.  It's a rarity, but in given these emotional issues,

1  my colleagues here could have come in very bombastically.  They

2  haven't.  And we've been working very well together.  I've

3  known Mr. Sandoval for some time.

4      THE COURT:  This has been professionally handled on

5  both sides.

6      MR. BARGHAAN:  Thank you, Your Honor.  I concur with

7  that completely.

8          Moreover, my client, ORR in particular, recognizes,

9  as you said at the very outset of this colloquy, the importance

10  of the issues and we take this very seriously.  We -- in fact,

11  my client wants clarity on some of these issues going forward

12  because there aren't -- there isn't, excuse me, any authority

13  in the federal court system on these questions.

14          And I'm not -- contrary to my colleague's

15  premonition, I'm not going to wax on about what is in the

16  records that we provided to Your Honor under seal.  R.M.B. and

17  his mother both have privacy interests, and I'm not going to

18  air those terribly in a public forum.  I presume the Court will

19  read them at its own leisure and make whatever determinations

20  it needs to in that respect.

21          But before getting even more into the merits, I

22  think it's important to key up -- clear up a key point about

23  the type of custody that we're describing here.  My colleagues

24  ask this Court to address this habeas petition as it would a

25  typical adult detention situation where the question is whether

1    the United States has the authority to detain in an appropriate

2    detention facility an adult on immigration charges.

3            Here the question is who or which entity is

4    entitled to exercise *in loco parentis* custody over this alien

5    child.   These arguments, the arguments that my colleagues

6    present to the Court, would be the same if R.M.B. had been

7    placed with a foster family by ORR, had been placed in a less

8    secure environment akin to a boarding school, which they do,

9    or, as he is now, in a juvenile detention facility.

10           ORR's charge, Your Honor, the very reason that the

11   Homeland Security Act established it, was to serve as an entity

12   independent of the immigration process - independent of the

13   enforcement arm of the federal immigration authorities so as to

14   have an independent and to protect the interest of the child.

15   And despite that that is the express raison d'être of this

16   agency, the petitioner here argues that ORR must shed itself of

17   that mandate.   Shed itself of that purpose the moment that

18   immigration proceedings terminate and must relinquish custody

19   of an alien child regardless of whether the individual to whom

20   custody will be relinquished will pose a risk to the child.

21           And federal statute simply does not require ORR to

22   shed itself of that obligation.   And as I said on Your Honor's

23   initial question, Section 1232(c) prohibits ORR from placing

24   custody of a child that has been entrusted to its care in any

25   custodian that it determines, or unless it determines, that the

1 custodian in question can take care of the physical and mental

2 well-being of the child and would not pose a risk to the child.

3 And that is exactly what ORR has done here.

4 ORR didn't blithely or arbitrarily make that

5 decision. It has engaged individuals independent and expert

6 opinions on that question. We provided the reports, as I have

7 said. And each of those reports has concluded that ORR ought

8 not relinquish custody to the petitioner here.

9 Your Honor, the rest of our arguments are pretty

10 well-established in our papers. Unless the Court has specific

11 questions --

12 THE COURT: Okay.

13 MR. BARGHAAN: -- on this, I'm happy to cede the

14 podium --

15 THE COURT: Okay.

16 MR. BARGHAAN: -- and be done.

17 THE COURT: Ms. Watson.

18 MR. BARGHAAN: I thank the Court for its time.

19 MS. WATSON: Just two quick remarks, Your Honor.

20 Counsel and I would agree and thank counsel for the spirit of

21 cooperation that we've shared over the past month or so. It's

22 never a joy to be in these types of cases, but it's made --

23 been made much less unpleasant than it need be.

24 THE COURT: Good. Glad to hear it.

25 Go ahead.

1          MS. WATSON:  Two points.  Counsel points to the TVPRA,

2     the Trafficking Victims Protection and Reauthorization Act as a

3     source of authority for ORR's obligation to make determinations

4     regarding a child's custody.  That, of course, presupposes the

5     lawful ORR custody in the first place.  Under -- under

6     respondent's theory if they came into custody either passively

7     or actively, they could in theory detain and make custody --

8     child custody determinations over thousands of children in this

9     custody, children just like R.M.B. who have deferred action

10    status, who are not in removal proceedings but yet could be in

11    ORR custody somehow.  I would just say that that source of

12    legal authorization must derive from lawful possession of the

13    child.

14          And the other thing that I would address is

15    counsel's concern about nothing says -- nothing requires ORR to

16    relinquish custody upon a termination.  And there actually is

17    something that requires that, and that's called the U.S.

18    Constitution.  It has long been held constitutional that the

19    government cannot interfere with the parent-child relationship

20    without the protections of due process of law.  And in this

21    case there has been no due process.  Their experts who at least

22    one of them we know receives substantial government funding on

23    an annual basis.  And all of those reports, those haven't been

24    challenged.  They're not subject to a neutral arbiter as child

25    custody cases in the state courts where, should state while the

1  child welfare agencies are involved.

2          Their authority to make those kinds of

3  determinations for immigrant children ends when those children

4  are no longer in immigration proceedings.  And then it's up to

5  the child's mother, or the State of Texas in this case, to make

6  those kinds of decisions whether it actually is in the child's

7  best interest, or in the case where a child truly is

8  unaccompanied and has no parents, then those decisions are best

9  left to the state child welfare agencies who are better

10  equipped to take care and more properly equipped to take care

11  of long-term needs for children who have been abandoned or

12  abused or neglected by parents.

13          THE COURT:  Okay.  Thank you.

14          You want to make one point, Mr. Barghaan?

15          MR. BARGHAAN:  Yeah, very quickly on the -- on the due

16  process point, Your Honor.  Assuming that there is a due

17  process interest here, the petitioner in this case has

18  exercised a right to be heard on ORR's determination that she

19  is not an adequate custodian under the TR -- TVRPA [sic].  She

20  knew of the home study that was done because she was a part of

21  it.  Never -- she never requested the file; never requested an

22  opportunity; never requested, as I said, the files so that she

23  could make her own statements on that.

24          There is a mechanism to be heard on these issues.

25  As we say in our papers, this is a final agency action by my

1  client.  They could have brought an Administrative Procedure

2  Act claim challenging that determination that more than

3  satisfies due process in this case, Your Honor.

4          I thank the Court for its time.

5          THE COURT:  Anything further?

6          MS. WATSON:  I won't belabor the point about due

7  process.  I think we've made that point.

8          THE COURT:  Okay.  I understand and it's in your --

9          MS. WATSON:  In our --

10         THE COURT:  -- papers as well.

11         MS. WATSON:  -- papers, Your Honor.

12         THE COURT:  Thank you.

13           Okay.

14         MS. WATSON:  Could I ask, Your Honor, given the nature

15  of this case when we might expect to hear from the Court so I

16  can let my client know?

17         THE COURT:  Ten days --

18         MS. WATSON:  Thank you --

19         THE COURT:  -- roughly.

20         MS. WATSON:  -- Your Honor.

21         THE COURT:  I'm going to enter this order on the

22  sealing memo that the Government has filed.  Any objection to

23  that?

24         MS. WATSON:  We don't have objection.  We weren't

25  contacted beforehand, but we don't object and won't object I

1    think going forward.

2           THE COURT:  Okay.  And just for your records, I've

3    entered it today.

4           MR. BARGHAAN:  Thank you, Your Honor.

5           THE COURT:  Thank you.  It's an important case, and

6    I'm going to try to get it out in about ten days for you.

7           MS. WATSON:  Thank you, Your Honor.

8           MR. SANDOVAL-MOSHENBERG:  Thank you, Judge.

9           THE COURT:  Thank you.

10          THE LAW CLERK:  All rise.

11             (PROCEEDINGS CONCLUDED AT 11:22 A.M.)

12                            -oOo-

13

14

15   UNITED STATES DISTRICT COURT    )
     EASTERN DISTRICT OF VIRGINIA    )

16

              I, JULIE A. GOODWIN, Official Court Reporter for
17   the United States District Court, Eastern District of Virginia,
     do hereby certify that the foregoing is a correct transcript
18   from the record of proceedings in the above matter, to the best
     of my ability.
19             I further certify that I am neither counsel for,
     related to, nor employed by any of the parties to the action in
20   which this proceeding was taken, and further that I am not
     financially nor otherwise interested in the outcome of the
21   action.
              Certified to by me this 16TH day of NOVEMBER, 2015.

22

23                       /s/
                         _____
                         JULIE A. GOODWIN, RPR
24                       CSR #5221
                         Official U.S. Court Reporter
25                       401 Courthouse Square
                         Alexandria, Virginia  22314