IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

DORA BELTRÁN, AS NEXT FRIEND    )
OF R.M.B., A MINOR,             )
                                )
     Petitioner,                )
                                )
v.                              )
                                )    1:15cv745 (JCC/JFA)
BRENT CARDALL, CHIEF PROBATION  )
OFFICER, YOLO COUNTY JUVENILE   )
DETENTION FACILITY, et al.,     )
                                )
     Respondents.               )

**M E M O R A N D U M   O P I N I O N**

In December of 2013, U.S. Customs and Border
Protection agents detained RMB – a minor – and designated him an
"unaccompanied alien child."  RMB was subsequently transferred
to the care of the Office of Refugee Resettlement (ORR) and
placed by that agency in "child welfare" custody.  His mother –
Petitioner Dora Beltrán – attempted to secure his release to her
care.  When ORR refused to release her son, she filed the
instant Petition for a Writ of Habeas Corpus.

On August 5, 2015, this Court denied the Petition and
Petitioner appealed.  The Fourth Circuit affirmed the judgment
in part, vacated it in part, and remanded the case for further
proceedings.  The Court is now tasked with applying the test set
out in *Matthews v. Eldridge*, 424 U.S. 319 (1976), to determine

1

whether ORR's family reunification procedures afforded RMB and Petitioner due process of law.  The Court concludes that they did not.  Accordingly, the Court will grant the Petition and order RMB's release.

## I. Background

A thorough description of the facts of this case may be found in this Court's prior opinion, *D.B. v. Poston*, 119 F. Supp. 3d 472 (E.D. Va. 2015), and in the opinion of the Fourth Circuit, *D.B. v. Cardall*, 826 F.3d 721 (4th Cir. 2016).  The Court therefore recites here only what is germane to its ruling.

Petitioner and her children entered the United States illegally from Guatemala in 2005, when RMB was six years old.  After settling in Rio Bravo, Texas, Petitioner remarried.

Petitioner's spouse was abusive.  As a result, Petitioner applied for and received legal immigration status – and eventually legal permanent residency – through the Violence Against Women Act (VAWA).  In February of 2013, U.S. Citizenship and Immigration Services granted RMB deferred action as a beneficiary of his mother's VAWA petition.  This did not confer legal immigration status upon RMB, but did render his removal from the country a low priority for the federal government.

RMB had a difficult childhood in Rio Bravo.  At 10, he began using alcohol and marijuana.  By the time he was 13, he

drank heavily.  At 14, he was addicted to heroin.  *See* Rep. Exh. 7 [Dkt. 48-7] ("RMB Decl.") ¶ 8.

RMB's trouble with the law began at age 12.  He was arrested for or charged with criminal mischief, runaway, theft, burglary, assault, possession of marijuana, assault causing bodily injury on a family member, and unauthorized use of a vehicle.  Most of these charges were dismissed, although RMB was prosecuted and placed on probation for making a terroristic threat.  Four charges – unauthorized use of a vehicle, violation of a court order, possession of marijuana less than two ounces, and assault causing bodily harm – remain pending.

In July of 2013, Petitioner moved her family from Rio Bravo to Corpus Christi, Texas – a distance of approximately 160 miles.  Petitioner hoped that the new environment would improve RMB's behavior.  In October of 2013, however, RMB ran away from home and returned to Rio Bravo.  Once there, a friend helped RMB to find work smuggling undocumented immigrants and illegal drugs into the United States from Mexico.  At the time, RMB was 14 years old.

RMB attributes his troubles to the influence of older youths who "worked for a cartel."  RMB Decl. ¶ 5.  He claims that these individuals "targeted" him, pretended to befriend him, and provided him with the drugs to which he ultimately became addicted.  *Id*. ¶¶ 5-8.  As a result, RMB found himself

3

working for the cartel to feed his habit. *Id*. ¶¶ 8-9. When he attempted to extricate himself from the cartel, two older boys drugged and sexually assaulted him while a third recorded the assault with a cell phone. *Id*. ¶ 11. According to RMB, it was Petitioner's learning of this incident that prompted their family's move to Corpus Christi. *Id*. ¶ 12.

RMB claims further that it was his addiction that forced him to return to Rio Bravo, where he could obtain drugs from the cartel. *Id*. ¶ 12. He states that he attempted to leave the cartel and return home, but a cartel member drugged him and forced him to watch videos depicting grisly deaths – the clear implication being that this would happen to RMB and his family should he choose to leave. *Id*. ¶ 15. RMB was therefore forced to remain and continue working for the cartel.

On December 15, 2013, U.S. Customs and Border Protection agents arrested RMB near the Mexican border. He informed one of the agents that he was there to aid in the transportation of undocumented immigrants into the United States. According to RMB, he permitted himself to be captured in an effort to escape the cartel. *Id*. ¶ 16.

The agents permitted RMB to contact Petitioner, who assembled her family's immigration documents and began driving to meet her son. One of the agents, however, called Petitioner and advised her that she should turn back and that her son would

4

be sent to a youth shelter.  When Petitioner protested, the agent threatened to arrest her.

Shortly thereafter, U.S. Customs and Border Protection determined RMB to be an "unaccompanied alien child," or "UAC" – a minor with no lawful immigration status whose parents are unavailable "to provide care and physical custody." 6 U.S.C. § 279(g)(2).  As such, it transferred RMB to the custody of ORR, an agency of the Department of Health and Human Services charged with the care of UACs.  U.S. Customs and Border Protection also initiated removal proceedings against RMB, presumably unaware of his deferred status.

On January 10, 2014, Petitioner submitted a family reunification application to ORR.  The agency evaluated the application and ordered a home study, which took place on February 10, 2014.

On March 12, 2014, Petitioner received a brief letter advising her that her application had been denied.  *See* Exh. G [Dkt. 11-7].  The letter explained that "[p]rior to releasing a child, ORR must determine that the proposed custodian is capable of providing for the child's physical and mental well-being." *Id*.  Because ORR had determined that RMB "requires an environment with a high level of supervision and structure," and it did not "appear . . . that [Petitioner's] home [could] provide the structure and supervision necessary," ORR would not

5

release RMB to his mother.  *Id*.  The letter further advised
Petitioner that she could request reconsideration within 30
days.

On March 11, 2015, after retaining counsel, Petitioner
submitted a request for reconsideration.  Several months later,
after initiating these proceedings, she received another brief
letter denying her request.  *See* Exh. H [Dkt. 11-8].  The second
letter largely reiterated ORR's earlier findings, noting that
RMB suffers from various behavioral and psychological problems.
*See id*.

On April 15, 2015, RMB made his first and only
appearance in the immigration proceedings initiated by U.S.
Customs and Border Protection.  At the hearing, the immigration
judge terminated the proceedings in light of RMB's deferred
status.

One month later, Petitioner filed the instant habeas
petition seeking her son's release and naming as Respondents
Darryl Poston, Executive Director of Northern Virginia Juvenile
Detention Center;[1] Robert Carey, Director of ORR; and Sylvia
Mathews Burwell, Secretary of the Department of Health and Human
Services.  Petitioner argued that RMB is not a UAC within the

---

[1]      On appeal, the Fourth Circuit permitted RMB to be
transferred to a California facility.  As a result, the Court
substituted Brent Cardall – RMB's current custodian – for Darryl
Poston pursuant to Federal Rule of Appellate Procedure 23(a).
*See Cardall*, 826 F.3d at 730 n.6.

meaning of 6 U.S.C. § 279(g)(2), and that his continued detention violates both substantive and procedural due process.

This Court denied the Petition, and Petitioner appealed to the Fourth Circuit.  The Court of Appeals affirmed this Court's judgment as to Petitioner's statutory and substantive due process claims, but remanded the case for this Court to consider her procedural due process claim under the test set out in *Matthews v. Eldridge*, 424 U.S. 319 (1976).

## II. Legal Standard

"Writs of habeas corpus may be granted by . . . the district courts . . . [but] shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §§ 2241(a), (c)(3); *see also Bowrin v. U.S. Immigration & Naturalization Serv.*, 194 F.3d 483, 487 (4th Cir. 1999) ("Since its inclusion in the Judiciary Act of 1789, § 2241 has given district courts jurisdiction to grant writs of habeas corpus to petitioners who are held in custody by the federal government in violation of the Constitution, laws, or treaties of the United States.") (citing 28 U.S.C. § 2241).

The district court "shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted."  28 U.S.C. § 2243.  "The person to whom the writ or order is directed shall make a return

7

certifying the true cause of the detention." *Id.* Ultimately, "[t]he court shall summarily hear and determine the facts, and dispose of the matter as law and justice require." *Id.*

### III. Analysis

In its previous opinion, this Court identified the right at issue in this case as "the alleged right of an alien child who has no available parent, close relative, or legal guardian . . . to nonetheless be placed in the custody of his parent, who cannot, at this time, properly care for his mental and physical needs." *D.B. v. Poston*, 119 F. Supp. 3d 472, 487 (E.D. Va. 2015). This, the Court concluded, "cannot be characterized as a fundamental right." *Id.*

The Fourth Circuit disagreed, finding that "[t]his proceeding involves 'perhaps the oldest of the fundamental liberty interests recognized by' the Supreme Court – 'the interest of parents in the care, custody, and control of their children.'" *D.B. v. Cardall*, 826 F.3d 721, 740 (4th Cir. 2016) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.)). Moreover, the Fourth Circuit recognized that children enjoy a reciprocal right to be "'raised and nurtured'" by their parents. *Id.* (quoting *Berman v. Young*, 291 F.3d 976, 983 (7th Cir. 2002)). Whether children enjoyed such a right had previously been "an open question in this Circuit." *Stratton v.*

*Mecklenburg Cty. Dep't of Soc. Servs.*, 521 F. App'x 278, 295
(4th Cir. 2013) (Gregory, C.J., concurring).

The Fourth Circuit noted that "[i]n most situations
. . . the constitutionality of state actions that interfere with
family integrity depends on the adequacy of the procedures
available to contest them." *Id*. at 741. This determination is
typically made "under the balancing standard that the Supreme
Court articulated in 1976 in *Mathews v. Eldridge*." *Id*. at 742.
The *Matthews* test evaluates "(1) the nature of the private
interest that will be affected, (2) the comparative risk of an
erroneous deprivation of that interest with and without
additional or substitute procedural safeguards, and (3) the
nature and magnitude of any countervailing interest in not
providing additional or substitute procedural requirements."
*Id*.

Finding that this Court did not apply the *Matthews*
test, the Fourth Circuit vacated the relevant portion of this
Court's prior opinion and remanded the case on that issue. It
now falls to this Court to apply the test and determine what
process was due.

### A. The Private Interest Affected

It is beyond dispute that Petitioner's right to the
care and custody of her son – and RMB's reciprocal right to his
mother's care, *see Cardall*, 826 F.3d at 740 – is "deserving of

9

the greatest solicitude." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 345-46 (4th Cir. 1994). "The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and rights far more precious than property rights." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (citations and alterations omitted); *see also Weller v. Dep't of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 394 (4th Cir. 1990) ("It is clear that the private, fundamental liberty interest involved in retaining the custody of one's child and the integrity of one's family is of the greatest importance.").

It is also apparent that Respondents' actions have encroached upon Petitioner's and RMB's right to family integrity considerably. Indeed, "[t]he forced separation of parent from child, even for a short time, represents a serious impingement on" that right. *Jordan*, 15 F.3d at 345. Petitioner and RMB have been separated for nearly three years. In light of the right at issue and the magnitude of the government's intrusion upon it, Respondents must counterbalance the first *Matthews* factor with a strong showing under the second and third factors.

## B. The Risk of Erroneous Deprivation

The Court begins its evaluation of the second *Matthews* factor by examining the context in which this case arises and the process Petitioner and RMB have received to date.

With the dissolution of Immigration and Naturalization Services (INS) in 2002, Congress entrusted the "the care and custody of all unaccompanied [alien] children, including responsibility for their detention, where appropriate," to the U.S. Department of Health and Human Services.  8 U.S.C. § 1232(b)(1).  The Department of Health and Human Services in turn delegated that responsibility to the Office of Refugee Resettlement.  This change in the law ensured that the federal agency charged with caring for UACs had no stake or say in any related immigration proceedings.  *See* 6 U.S.C. § 279(c); 153 Cong. Rec. S3001, S3004 (daily ed. Mar. 12, 2007) (statement of Sen. Feinstein) ("This change finally resolved the conflict of interest inherent in the former system that pitted the enforcement side of the [INS] against the benefits side of that same agency in the care of unaccompanied alien children.").

When ORR takes custody of a child, it places the child into a facility with security restrictions commensurate to the risk ORR determines that child to pose to him or herself and others.  *See Poston*, 119 F. Supp. 3d at 480-81 nn.7-9.  Since assuming custody of RMB, ORR has held him in juvenile detention facilities – the most restrictive available setting.  The Court notes that this has largely deprived Petitioner of meaningful contact with her son.  *See* Rep. Exh. 4 [Dkt. 48-4] ¶¶ 3-6.

ORR may place a child in its custody with a private sponsor.  It may not, however, release a child to "a person or entity unless [it] makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being."  8 U.S.C. § 1232(c)(3)(A).  ORR must additionally make "an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child."  *Id*.

ORR requires potential sponsors to submit a family reunification application.  The application consists of a short form requesting certain basic information – for example, the proposed sponsor's relationship to the child, as well as his or her income.  In accordance with ORR's procedures, Petitioner submitted this form on January 10, 2014, providing the information requested.

Respondents claim in their brief that "nothing prevent[ed]" Petitioner from submitting her own narrative statement or other additional information with the application.  Opp. [Dkt. 47] at 7.  ORR's form, however, does not apprise the applicant of this opportunity.  Nor, for that matter, do any of the other materials available to potential sponsors.  Indeed, the Court can find no mention of this opportunity outside of Respondents' brief.  There is no indication in the record that Petitioner had notice of this opportunity.

Once ORR receives an application, it begins a
background check on the proposed sponsor.  Respondents claim
that this process "require[s] the participation of the sponsor
him or herself, and thus provide[s] an opportunity for the
sponsor to explain to ORR why reunification would not pose a
danger to the UAC and is thus appropriate."  *Id.*  Respondents do
not, however, explain further what this process entails.  There
is no indication in the record that Petitioner was contacted
during this process.  Respondents do not appear to contend
otherwise.

If, after the background check, a "proposed sponsor
clearly presents a risk of abuse, maltreatment, exploitation, or
trafficking to the child based on all available objective
evidence," ORR will order a "home study."  8 U.S.C.
§ 1232(c)(3)(B).  This entails an inspection of the proposed
sponsor's home and a series of interviews conducted by an
independent contractor.  ORR ordered a home study in this case,
which took place on February 10, 2014.

Respondents describe this as a "collaborative" process
during which "the family member seeking reunification is . . .
able to provide the assessor with any information that he or she
thinks pertinent or important in evaluating the reunification
application."  Opp. [Dkt. 47] at 8-9.  Petitioner disputes this
characterization of the process; indeed, she claims that the

13

scope and purpose of the home study were never explained to her. *See* Traverse Exh. A [Dkt. 16-1] ¶ 22.

The contractor who conducted the home study ultimately recommended against releasing RMB to Petitioner's care.  Her reasoning centered primarily on RMB's behavioral problems rather than Petitioner's parental fitness. *See* Exh. D [Dkt. 11-4] at 13.[2]  Much of the support the contractor gathered for her findings derived from interviews and other research conducted outside of Petitioner's presence, and apparently without her knowledge.  *See id*. at 3-7.  It does not appear that the contractor ever informed Petitioner of her findings, or that Petitioner had an opportunity to contest them.  *See* Rep. Exh. 4 [Dkt. 48-4] ¶¶ 8-10.

A month after the home study, on March 12, 2014, Petitioner received a short letter advising her that her application had been denied.  *See* Exh. G [Dkt. 11-7].  The letter explained that "[p]rior to releasing a child, ORR must determine that the proposed custodian is capable of providing for the child's physical and mental well-being."  *Id*.  Because

---

[2]     The independent contractor did note that Petitioner was "unable to provide [a] safety plan for the minor."  Exh. D [Dkt. 11-4] at 13.  It is unclear, however, what this means. The only "safety plan" the Court is able to find referenced in ORR's materials refers to a document provided by ORR to the sponsor, not vice versa.  It appears that Petitioner was never apprised of the need for a "safety plan," or what such a plan entails.  *See* Rep. Exh. 4 [Dkt. 48-4] ¶ 9.

ORR had determined that RMB "requires an environment with a high level of supervision and structure," and it did not "appear . . . that [Petitioner's] home [could] provide the structure and supervision necessary," ORR would not release RMB to the custody of his mother.  *Id.*  The letter further advised Petitioner that she could request reconsideration within 30 days.  It did not include any further elaboration on ORR's reasoning or the bases for the agency's conclusions.

The Court notes that, notwithstanding ORR's determination, Petitioner has not been declared an unfit parent. The primary evidence in the record regarding Petitioner's parental fitness is ORR's home study.  *See* Exh. D [Dkt. 11-4]. In it, Petitioner is depicted as a "concern[ed] and motivate[ed]" parent, who successfully cares for RMB's siblings. *Id.* at 12-13.  The report recommends against releasing RMB to Petitioner's care in spite of, rather than due to, her capacity as a parent.  The concerns expressed therein primarily relate to RMB's behavioral problems and Petitioner's husband's history of spousal abuse.  The latter issue was addressed some time ago, as Petitioner's spouse moved out in 2014.  *See* Rep. Exh. 4 [Dkt. 48-4] ¶ 11.[3]

---

[3]     Petitioner did, however, once briefly lose custody of her children.  In December of 2012, Petitioner was pulled over while driving a friend's child to school.  *See* Exh. D [Dkt. 11-4] at 10.  When she informed the officer that she had left her

On March 11, 2015, after retaining counsel, Petitioner submitted a request for reconsideration.  Several months later – after initiating these proceedings – she received another brief letter denying her request.  *See* Exh. H [Dkt. 11-8].  The letter reiterated ORR's earlier conclusions, noting that RMB suffers from behavioral and psychological problems.  *See id*.

In sum, the record shows that Petitioner was afforded (1) the opportunity to submit an application requesting that her child be released to her, (2) the opportunity to address an independent contractor sent by ORR to evaluate her parental fitness one month later, and (3) the opportunity to request reconsideration of the ORR's adverse decision a month after that.  This process exhibits several deficiencies.

The first relates to the notice component of due process.  It is a principle that has "remained relatively immutable" in due process jurisprudence "that where governmental

---

children home alone, the officer arrested her and informed Texas Child Protective Services.  *See id*.  As a result, the state of Texas removed Petitioner's children from her custody for several months.  Petitioner regained custody of her children in May of 2013 after completing a court-ordered course on parenting.  *See id*.  While troubling, Respondents do not contend that this incident shows Petitioner to be an unfit parent.  Indeed, for Respondents to do so would largely contradict the findings of ORR's home study.  Moreover, "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."  *Santosky v. Kramer*, 455 U.S. 745, 753 (1982).

action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene v. McElroy*, 360 U.S. 474, 496 (1959).

Here, it does not appear that Petitioner was made aware of any of the evidence or factual findings upon which ORR relied in withholding RMB from her care and custody. Indeed, even after ORR made that decision, it explained its reasoning only in exceedingly general terms. *See* Exh. G [Dkt. 11-7]. This opaque procedure deprived Petitioner of any opportunity to contest ORR's findings, and thus any meaningful opportunity to alter its conclusions.

This procedural deficiency was exacerbated by the unilateral nature of the proceedings before ORR. When ORR determined that it would not release RMB to his mother's care, it fell to Petitioner to change the agency's mind. When she was unable to do so, it fell to her to initiate court proceedings. The presumption was at all times that RMB would remain in ORR custody. At no point was the onus on ORR to justify its deprivation of Petitioner's fundamental parental rights.

Supreme Court and Fourth Circuit precedent hold that, where parental rights are concerned, this manner of process is inadequate. Once the government decides to withhold a child

17

from a parent's care, "the state has the burden to initiate" proceedings to justify its action. *Weller*, 901 F.2d at 396.

In *Stanley v. Illinois*, 405 U.S. 645 (1972), for example, the Supreme Court invalidated a law under which the children of widowed, unmarried men were automatically deemed wards of the state, forcing their fathers to apply to regain custody. The Court held that while this sort of "[p]rocedure by presumption is always cheap[ ] and eas[y]," where parental rights are concerned, "it needlessly risks running roughshod over the important interests of both parent and child." *Id.* at 656–57.

Similarly, in *Weller v. Department of Social Services for City of Baltimore*, 901 F.2d 387, 395 (4th Cir. 1990), the Fourth Circuit found that where "'the continued separation of the family by retention of custody [is] based on a unilateral and untested evaluation of the mother's fitness as a parent . . . the state cannot constitutionally 'sit back and wait' for the parent to institute judicial proceedings'" or "'adopt for itself an attitude of 'if you don't like it, sue.'" *Weller*, 901 F.2d at 395 (quoting *Duchesne v. Sugarman*, 566 F.2d 817, 827–28 (2d Cir. 1977)). The Court held that the onus must be on the government, once it has decided to withhold a child from a parent's care, to justify its actions. *See id.* at 396. The alternative is to risk "depriving individuals of a most basic

18

and essential liberty interest which those uneducated and uninformed in legal intricacies may allow to go unchallenged for a long period of time." *Id.* (quoting *Duchesne*, 566 F.2d at 828).

This general rule must accommodate the practical realities of the situation before the Court, as due process is flexible and fact-bound. *See Jordan*, 15 F.3d at 348.  RMB was apprehended at the border alone, having run away from home.  It would therefore have been impracticable to provide a hearing before or immediately after taking him into custody.  Moreover, the agency was not required to provide a hearing prior to evaluating Petitioner's family reunification application, as the agency had not yet determined to withhold RMB from Petitioner's care.  *Cf. Daniels v. Williams*, 474 U.S. 327, 331 (1986) (noting that due process concerns itself primarily with "deliberate decisions of government officials").  And while the length of time ORR took to process Petitioner's family reunification application raises due process concerns, *see Jordan*, 15 F.3d at 344-45, the Court allows that, given the complex situation facing the agency, that delay alone likely did not violate due process.

At a minimum, however, once ORR decided to withhold RMB from Petitioner's care, ORR "ha[d] the burden to initiate" proceedings to justify its action.  *Weller*, 901 F.2d at 396; *see*

19

*also Stanley*, 405 U.S. at 656-57; *Duchesne*, 566 F.2d at 827-28; *Gomes v. Wood*, 451 F.3d 1122, 1128 (10th Cir. 2006) (listing cases).  At that point, ORR owed Petitioner some form of adversarial process, and could not simply require Petitioner to change the agency's mind.  In other words, having determined that it would deprive Petitioner and RMB of their fundamental right to family integrity, ORR could not "adopt for itself an attitude of 'if you don't like it, sue.'" *Weller*, 901 F.2d at 395 (quoting *Duchesne*, 566 F.2d at 827-28).[4]

The Court's conclusion that a substantial hearing was required here is bolstered "by the character of the inquiry that must be undertaken" in determining whether to release a UAC to a parent.  *Jordan*, 15 F.3d at 347.  Adversarial hearings are frequently required where "subjective judgments that are peculiarly susceptible to error" are at issue. *Id*. at 347.  Whether a parent "is capable of providing for [a] child's physical and mental well-being," 8 U.S.C. § 1232(c)(3)(A), is a complex and subjective inquiry.  What care best suits the well-being of a child has not been, and likely cannot be, reduced to

---

[4]      Respondents note that Petitioner could have sought review of ORR's final decision under the Administrative Procedures Act.  Given the foregoing discussion, as well as the APA's deferential "arbitrary and capricious" standard, *see Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), the Court finds that the availability of APA review is of little constitutional significance here. *See Weller*, 901 F.2d at 394.

a formula capable of producing a ready answer.  That ORR undertook to make such a subjective judgment without any form of hearing further deprived Petitioner of a meaningful opportunity to present her case.[5]

Turning to Respondents' Opposition, Respondents tout the "fulsome" procedures ORR followed here.  *See* Opp. [Dkt. 47] at 2-10.  Virtually all of those procedures, however, consisted of internal evaluation and unilateral investigation.  In effect, Respondents contend that due process was satisfied here because ORR made a significant effort to reach the correct decision.  But due process does not concern itself only with the degree to which one can trust the government to reach the right result on its own initiative; rather, due process is measured by the affected individual's opportunity to protect his or her own interests.  *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982) ("the Due Process Clause grants the aggrieved party the opportunity to present his case").

Respondents contend that Petitioner had an adequate opportunity to do so here because "nothing prevent[ed]" or "preclude[d]" or "prohibit[ed]" her from providing the agency with whatever information she pleased.  *See* Opp. [Dkt. 47] at 7,

---

[5]      This is not to say that such a hearing would be required where fundamental parental rights are not at issue, or where ORR has not yet determined to deprive an individual of such rights.

9, 25.  As discussed above, however, it does not appear that Petitioner had notice of that opportunity.  Moreover, the Court is unpersuaded that Petitioner's not being "prevented" or "precluded" or "prohibited" from presenting information – particularly without first being apprised of the agency's specific concerns – constituted the sort of "fundamentally fair procedures" required here.  *Santosky*, 455 U.S. at 754.

Respondents cite no case in which procedures comparable to those described above were deemed adequate to adjudicate fundamental parental rights.  Rather, Respondents appear to argue that the cases upon which Petitioner relies, such as *Stanley*, *Weller*, and *Jordan*, simply do not apply.

The Fourth Circuit, however, has already found that "[t]his proceeding involves . . . 'the fundamental liberty . . . interest of parents in the care, custody, and control of their children.'"  *Cardall*, 826 F.3d at 740 (quoting *Troxel*, 530 U.S. at 65 (plurality op.)).  Respondents have deprived Petitioner of that fundamental liberty interest, and RMB of his reciprocal interest in his mother's care.  The principles set out in *Stanley*, *Weller*, and *Jordan* regarding what due process requires when a child is removed from a parent's care clearly have *some* application here.

Respondents contend that the Fourth Circuit held otherwise when it "reject[ed] [Petitioner]'s contention that due

process automatically required that R.M.B. be accorded a more substantial hearing prior to [ORR] rejecting the family reunification request." *Cardall*, 826 F.3d at 743.  The key word in that holding, however, is "automatically."  The Fourth Circuit remained carefully agnostic as to what process was due, leaving it to this Court to apply the *Matthews* test in the first instance.  *See id*.  Indeed, just as the Fourth Circuit refused to hold ORR's procedures "automatically" unconstitutional, it likewise declined to hold those procedures to be constitutional on their face.  *See id*.

Respondents argue further that the cases cited above do not apply because RMB was apprehended after running away from home rather than physically removed from his household. Respondents cite no legal support for this proposition, and the Court fails to see its logic.  While RMB's apprehension at the Mexican border limited, as a practical matter, the process that could have been afforded *before* RMB was taken into custody, that circumstance has no apparent bearing on his continued detention months later.  Respondents have not articulated any reason why RMB's flight from home would diminish RMB's and Petitioner's constitutional interest in family integrity or the likelihood that ORR's procedures would erroneously deprive them of that interest.

The Court notes as well that while RMB may have run away to Rio Bravo, it is not clear that his decision to remain there was his own.  RMB claims that he was coerced into staying by a criminal cartel, and that he desired to return to his family.  Moreover, RMB claims that he permitted himself to be captured in an attempt to escape the cartel and return home.

Finally, Respondents contend that the "unique situation" in which ORR found itself "renders the instant issue *sui generis* such that the above authority" does not squarely apply.  Opp. [Dkt. 47] at 22-23.  This appears to be a legalistic way of claiming that ORR exercises all of the powers of child protective services but is subject to none of the same constitutional limitations.  The Court is unpersuaded.

Before moving on to the third and final *Matthews* factor, the Court notes an additional wrinkle.  In her Reply, Petitioner claims that her position on remand is that a hearing only came due after the termination of RMB's removal proceedings.  The Court disagrees.

Pursuant to 8 U.S.C. § 1226, "an alien may be arrested and detained pending" removal proceedings. Respondents, however, do not cite that statute to justify their detention of RMB. That is because, as this Court noted in its prior opinion, RMB is not in "immigration detention."  *See* Mem. Op. [Dkt. 25] at 27-29.  Rather, ORR has at all times held RMB in "child welfare"

custody pursuant to its authority under 8 U.S.C. §§ 1232(b)(1) and 1232(c)(3)(A). ORR has not withheld RMB from Petitioner's care due to pending removal proceedings; indeed, ORR was as capable of returning RMB to Petitioner's care during the pendency of those proceedings as it is now. ORR has instead withheld RMB from his mother's care due to child welfare concerns. The termination of removal proceedings against RMB therefore has little bearing on the issue now before the Court. *See Cardall*, 826 F.3d at 742 ("[T]hat R.M.B. was afforded a brief hearing before an immigration judge is irrelevant to the procedural due process claim, because [ORR] possesses the sole authority to order his release."); *see also* 153 Cong. Rec. S3001, S3004 (daily ed. Mar. 12, 2007) (statement of Sen. Feinstein) (noting that Congress intentionally withheld from ORR any role in removal proceedings pending against UACs).

In sum, the deficient procedures employed by ORR created a significant risk that Petitioner and RMB would be erroneously deprived of their right to family integrity. This risk could have been mitigated by additional procedural safeguards. Given this risk and the magnitude of the private interest at stake, Respondents must demonstrate that an extraordinarily compelling interest justified ORR's failure to accord Petitioner and RMB additional procedures.

### C. The Government's Interest in Not Providing
####   Additional Process

Respondents note that "[t]he parent's right to custody is subject to the child's interest in his personal health and safety and the state's interest as *parens patriae* in protecting that interest." *White by White v. Chambliss*, 112 F.3d 731, 735 (4th Cir. 1997). But while it is true that the government has an interest in protecting the welfare of children, "the State registers no gain towards" that end "when it separates children from the custody of fit parents." *Stanley*, 405 U.S. at 652. Indeed, when the government does so, it harms the interests of all involved. The government therefore "shares the parent's interest in an *accurate and just* decision." *Lassiter v. Dep't of Soc. Servs. of Durham Cty.*, 452 U.S. 18, 27 (1981) (emphasis added). This does not present a "countervailing interest in not providing additional or substitute" procedural safeguards here, where their added benefit would have inured to both Petitioner and the public. *Cardall*, 826 F.3d at 742.

Respondents argue further that requiring ORR to provide a hearing as part of its process would overwhelm its resources, as the agency is charged with the care of many thousands of children every year – 57,496 children in 2014 alone. But nobody has suggested that due process requires "a live, trial-like proceeding on each of these children before ORR

can proceed." Opp. [Dkt. 47] at 27. This case concerns the fundamental right of a parent to the custody of her child, and that child's reciprocal right to his parent's care. Where no parent is seeking custody of their child, the cases cited above have no application.

Moreover, in the vast majority of cases, ORR releases children entrusted to its care rather than detaining them. For example, in 2014, 53,518 of 57,496 children – or roughly 93% – were released to custodians after a relatively brief stay in ORR custody. Of the 3,978 who remained in ORR custody, there is no indication in the record how many were detained over the objection of a parent. Even assuming that a significant proportion was, the Court cannot say that the requirement ORR provide an adversarial hearing in such instances would impose the catastrophic administrative burden Respondents fear. Whatever burden it would impose is not sufficient to overcome the first two factors of the *Matthews* test in this instance.

Finally, the Court notes that at oral argument Respondents' counsel conceded that RMB's position is unique. The argument that providing a hearing would have entailed significant administrative burdens therefore rings particularly hollow.

### D. Remedy

It appears this may be an instance of a square peg meeting a round hole.  RMB's case is unique, and so it is unsurprising that the procedures ORR presently employs failed to account for its special circumstances.

The Court will not undertake to design additional procedures for ORR to follow in this case.  The Court is neither competent to do so, nor inclined to encroach upon an area of the law traditionally reserved to state courts.  Moreover, RMB has already been held in ORR's custody for nearly three years, and is rapidly approaching adulthood.  Respondents' counsel informed the Court at oral argument that ORR will release RMB once he turns 18.  Affording Petitioner and RMB additional process at this point would therefore be of marginal benefit.

Federal courts have "broad discretion in conditioning a judgment granting habeas relief."  Hilton v. Braunskill, 481 U.S. 770, 775 (1987).  In light of the foregoing, the Court finds that no conditions are warranted in this case.  The Court will therefore grant the Petition for a Writ of Habeas Corpus outright and require that RMB be released to Petitioner's care and custody.  Should Respondents believe Petitioner to be unable to care for RMB, or that RMB presents a risk to himself or others, they may refer the matter to appropriate state and local authorities.

### IV. Conclusion

The process afforded Petitioner and her son here did not meet the test set out in *Matthews v. Eldridge*, 424 U.S. 319 (1976).  The Court, however, must in closing emphasize the narrowness of its holding.  The due process inquiry is fact-bound and flexible.  *See Cardall*, 826 F.3d at 743.  The analysis above is confined to RMB's case, which Respondents assure the Court is unique.

For the foregoing reasons, the Petition for a Writ of Habeas Corpus shall be granted.

An appropriate order will issue.

<table>
<tr><td></td><td>/s/</td></tr>
</table>

November 22, 2016                      James C. Cacheris
Alexandria, Virginia          UNITED STATES DISTRICT COURT JUDGE